[No. S011323. June 1, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID ESCO WELCH, Defendant and Appellant.

710

716

720.

## Counsel

George C. Boisseau, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**THE COURT.**—A jury found defendant David Esco Welch guilty of six counts of first degree murder in a single incident during the morning of December 8, 1986. It also found him guilty of two counts of attempted murder in connection with the same incident, and one count of concealing a firearm as a felon. It found true a multiple-murder special-circumstance allegation. (Pen. Code, § 190.2, subd. (a)(3).)[1] At the penalty phase, it fixed his sentence at death. The trial court sentenced him accordingly. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

[1]All further unspecified statutory references are to the Penal Code.

## I. STATEMENT OF FACTS

### A. *The Prosecution's Case*

In the morning hours of December 8, 1986, defendant and his girlfriend at the time, Rita Lewis, broke down the front door of Barbara Mabrey's home in Oakland, and killed six persons as they were sleeping in various rooms. Among the dead were Dellane Mabrey, the 16-year-old daughter of Barbara Mabrey and former lover of defendant, Sean and Darnell Mabrey, Barbara Mabrey's 21-year-old and 22-year-old sons, Catherine Walker and her 4-year-old son, Dwayne Miller, and Valencia Morgan, Dellane Mabrey and Leslie Morgan's 2-year-old daughter. Four people survived the attack: Barbara Mabrey escaped through the back door; her son Stacey Mabrey avoided detection by hiding in a bedroom closet; Leslie Morgan, though shot in the arm, feigned death and later escaped through the back door; and Dexter Mabrey, a nine-month-old child, was only grazed by one of the bullets that killed his mother and sister.

Dellane and Valencia had been shot in the head at close range. Sean had been shot in the chest and head while sleeping on the living room couch. His wounds were fatal, puncturing the aorta. Darnell Mabrey had also been fatally shot in the head while sleeping. Catherine Walker and Dwayne Miller had been shot while sleeping on the sofa in the den. They, too, had both been shot in the head at close range while asleep.

Defendant and the Mabreys had serious difficulties with each other in the few months before the shooting. Barbara Mabrey had met defendant in early 1986. Her daughter, Dellane, was dating defendant and said that defendant was Dexter's father. Around September 1986 Barbara and defendant had an argument over Dellane, with Barbara telling him to stay away. On October 9, 1986, shortly after Dexter was born, defendant broke into the house and at gunpoint took Dexter away from Barbara. Dellane and her daughter Valencia went with defendant and were gone for three days.

A few days later, when Barbara was going to the store, defendant drove up to her and spat at her from the car window, yelling "Bitch, you are dead." He followed her home, striking her in the knee with his car as she tried to flee into her home and laughing as he did it. A day later he told one of Barbara's friends to stay out of his business and to tell Barbara that she is a "dead bitch." On October 20, 1986, he confronted her again at a neighborhood market, throwing a liquid into her face. After cursing at her, he knocked her down and kicked her several times as she was on the ground. He escaped from the police on his motorcycle.

On October 29, 1986, defendant entered the Mabrey house about 3:00 a.m. with a friend named Kenny and confronted Leslie Morgan and Dellane, slapping the latter in the face. He pointed the pistol at Barbara, telling her not to get near him and saying that she "better not go to court and testify against him or his people" or else they were going to "take care of" her, and that she would be killed slowly, shooting her arms off first and then her legs. He also ordered Leslie Morgan to leave, forcing him to flee in his underwear. He pointed a .45-caliber pistol towards the floor as he left Dellane's room. He told Darnell Mabrey "don't do anything" as he pointed the gun in Darnell's direction. He left the residence.

Defendant was arrested for the October 29th incident, and wrote Barbara a letter from jail requesting that she drop the charges. He was eventually released on bail.

While at home with Dellane, Darnell, Sean, Stacey, Valencia and Dexter, Barbara received a visit from defendant on December 6, 1986, who apologized to her, although Barbara did not accept the apology. He came over with his two pit bull puppies, which had been placed in the yard, and, when he discovered one of them to be missing, angrily began accusing Darnell, Sean and Steve Early (who was also at the house) of taking the puppy. Denying he had taken the dog, Early left in his car with defendant close behind. As defendant left he told those present they had better find his dog or they would all be dead. Defendant then shot through Early's back window, all the while saying, "you stole my dogs, you motherfucker." He also said, as he was leaving, that they had better find his dog or they would all be dead.

Early the next day, on December 7, 1986, defendant and Rita Lewis went to the Mabrey house, asking Barbara not to testify against him in court, where she was scheduled to appear on December 9. He also talked about Barbara's involvement in taking his dogs. Later that evening, Stacey's car was hit by a car driven by Vanessa Walker. A car with defendant, Dolores Walker, and two men, "Billy the Kid" and William Henderson, drove up to the scene. Defendant got out of the car with a pistol in his hand and pistol-whipped Stacey's friend Perry. He kicked Dolores out of the car, saying something about a dog. Barbara heard him say that "you Stone City niggers"—referring to the Stonehurst area of Oakland—"better get my dog or somebody's going to die." Later he told Dolores Walker that "its [*sic*] going to be some bullshit tonight."

In the early morning hours of December 8, 1986, defendant returned to the Mabrey house. Stacey, Barbara and Leslie Morgan all identified defendant as the shooter that morning. They all identified Lewis as his accomplice.

According to this testimony, defendant was carrying an Uzi carbine in his hand and Lewis was holding a .38-caliber revolver. Stacey Mabrey went to his room and hid near the closet as defendant looked past him in the room and asked, "where's Chuck," Stacey's younger brother, who normally slept in the room. Stacey heard several more shots. Urged by Lewis to leave, defendant left the house, limping and holding on to Lewis and another person who helped him into a car.

Barbara also woke up to gunshots and heard Dellane screaming, "no, Moochie,[2] don't." She saw Lewis pointing a gun and telling defendant to get out of the way. Lewis had a pistol in her hands and Barbara heard more gunfire before she escaped out of the house by the rear.

Leslie Morgan testified that defendant stood at close range as he shot Dellane, saying, "this is for you, bitch." He also shot Valencia in the head. Leslie grabbed him and struggled with him, knocking his Uzi to the ground. Rita Lewis shot Leslie in the shoulder as they struggled. After defendant found his gun, he shot Leslie twice more in the arm and Leslie played dead. Leslie did, however, see defendant straddle Dellane's body and heard another gunshot.

Defendant and Lewis went to Beverly Jermany's residence at 2116 103d Avenue in Oakland shortly after the murders, about 5:00 a.m. Defendant, who was a second cousin of Jermany's, was lying on the porch and could not walk. He was in pain and only semiconscious. Lewis told Jermany that she had accidentally shot him. She was carrying a pillowcase. Jermany asked Lewis whether it contained drugs and she said it did not. She took the pillowcase outside and did not return with it. Jermany eventually notified the police that defendant was at her house, and he and Lewis were apprehended.

The murder weapons were found in a pillowcase in the backyard of Jermany's house. There was an Uzi, a Smith and Wesson .357 handgun and a .38-caliber Taurus revolver. The Uzi had a twenty-five-round capacity and was loaded with one round in the chamber and four rounds in the magazine. The .357 handgun was loaded and contained three live rounds and three spent rounds. The .38-caliber revolver was loaded with two live rounds and four expended cartridges. One slug recovered at the murder scene was fired from a Smith and Wesson .357. Other bullet fragments could have been fired by either a Smith and Wesson or a Taurus.

Burned clothing was recovered from the fireplace. Blood found on tennis shoes recovered from 2116 103d Avenue matched Leslie Morgan's blood.

---

2"Moochie" was defendant's nickname.

One of the tennis shoes could have made a shoe print found on Barbara Mabrey's front door.

### B. *The Defense*

The defense was characterized by differing strategies by trial counsel and by defendant. Defendant was the first witness for the defense. Taking the stand without a recess, and over defense counsel's protest that he wanted time to speak with him to find out what questions to ask, defendant testified generally that he did not commit the murders. He declined to answer questions about who had shot him, and testified that he was shot in the leg between midnight and 5:00 a.m. in an incident at Scotty's liquor store, rather than at Barbara Mabrey's home. Defendant claimed that he had nothing to do with the shooting at the house the morning of December 8, 1986, and never threatened any of the Mabreys. He had gone to his cousin's house after being wounded because he believed there might be warrants for his arrest related to other matters. He also testified that he was a victim of mistaken identity, and that it must have been some other "Moochie" who had committed the murders.

The thrust of the defense presented by trial counsel, on the other hand, was that defendant's mental impairment from drug and alcohol intoxication at the time he committed the murders was such that he lacked the premeditation and deliberation necessary for a first degree murder conviction. A urine screen and qualitative blood analysis had been performed on blood drawn from defendant on December 8, 1986. Defendant had alcohol in his blood, and cocaine and morphine, a metabolite of heroin, in his urine. A quantitative analysis was never performed, so the exact amounts of alcohol, heroin, and cocaine defendant had consumed could not be estimated. Dr. Paul Herrmann explained the effects that these substances can generally have on the central nervous system. Alcohol and heroin, both depressants, and cocaine, a stimulant, whether consumed separately or in combination, can have a deleterious effect on motor skills and mental functioning, even at very low levels. Testimony to the same effect was provided by Dr. Fred Rosenthal, who also listed sleep deprivation as an additional factor affecting coherent thought processing. Trial counsel also presented a number of witnesses acquainted with defendant for the apparent purpose of demonstrating that he tended to act impulsively.

### C. *Penalty Phase*

#### 1. *Prosecution Evidence in Aggravation*

The prosecution introduced evidence that defendant had been convicted of three prior felonies: assault with a deadly weapon, in violation of section

245, subdivision (a), on May 8, 1981; receiving stolen property, in violation of section 473, on August 5, 1981; and assault on a police officer in violation of section 243, subdivision (c), on April 7, 1983.

Evidence of a number of instances of uncharged violent conduct was also introduced. While in juvenile hall in October 1973, defendant hit a counselor and spit on him as he was trying to run away from the facility. He had just been brought down for disciplinary problems from one of the camps to a more secure facility.

Defendant, when he was a juvenile, discharged a shotgun into Faye McPherson's residence on December 26, 1975. The McPhersons had been his neighbors for 11 years and had not previously had any problems with him. The blast damaged the walls above her child's crib.

On March 20, 1979, defendant was involved in a high-speed chase with several San Francisco police officers. When the police finally stopped his motorcycle, he got off and a struggle ensued, with defendant punching and kicking the officers. He hit one of the officers with clenched fists and kicked him as well. He also tried to run over another officer with his motorcycle, getting within three to five feet before the officer jumped out of the way.

On December 20, 1979, defendant assaulted Oakland Police Officer Rosemary Dixon while she was working at the warrant division at the station house; she suffered serious injuries as a result of the assault.

Defendant raped and sodomized Jaunell T., a former lover, on May 21, 1980.

On January 22, 1985, while in maximum security custody, defendant got into a fight with another inmate. He did not stop fighting when ordered and eventually had to be subdued with Mace.

On July 12, 1985, he fought with another inmate while they were being transported to jail from court.

On December 16, 1987, while in custody for this case, defendant refused to go to court and started swinging at one of the correctional officers. He gave Deputy Charles Utvick a glancing blow to the side of the head. He made a statement to Deputy Mark Johnson that he was going to kill him or have him killed, and that he would have the rest of the deputies taken care of as well.

Several instances of violent behavior while defendant was incarcerated at state prison were introduced. On December 9, 1981, while in a visiting

room, he grabbed his wife, Terry West, by the neck and threw her against the wall. On February 19, 1982, defendant struck a correctional officer in the jaw. On June 24, 1982, he spit on Correctional Captain Steven D. Lawrence several times after Lawrence meted out a 30-day loss of privilege following a disciplinary hearing. Shortly thereafter when he got back to his cell from the disciplinary hearing he threw some fecal matter at Correctional Officer Roy Wade Gowin, hitting Gowin in the face. He then started hitting Gowin and another officer, swinging the handcuffs during the struggle. Gowin was struck twice by the handcuffs during the struggle and required medical treatment for the cuts on his forehead and eyebrow. Defendant also bit him.

On September 25, 1982, while in jail, defendant struck a deputy sheriff in the face with a closed fist. After the deputy sprayed defendant in the face with Mace, the defendant hit the deputy again in the face with his fists. The deputy suffered lacerations of his chin and left eye and several cracked ribs, and lost time from work for about two weeks.

## 2. *Defense Mitigation Evidence*

Defendant told the trial court that he did not want to put on any mitigating evidence. Over his protest, trial counsel indicated that he had, and would put on, two mitigation witnesses to show that defendant was under the influence of extreme mental or emotional disturbance at the time of the murders and that he lacked the ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law as a result of mental disease or defect, or the effects of intoxication. Dr. William D. Pierce, a clinical psychologist, and Samuel Benson, Jr., a psychiatrist, testified in mitigation. Defendant did not.

Dr. Pierce reviewed defendant's school records, juvenile court records, adult criminal history records, and records relating to the murders. He opined that defendant was mentally ill and had been so for a long time, suffering from delusional paranoid disorder, psychoactive substance abuse disorder, paranoid schizophrenia, impulsive personality disorder, and an organic personality syndrome of an explosive type. His delusional paranoid disorder was of a persecutory type. His mental problems started as early as kindergarten, and were characterized by uncontrolled behavior. Defendant never received any treatment for his disorders, either in or outside of custody. His behavior was characterized by mistrust, paranoia, and the inability to control aggressive acting out. Alcohol, cocaine and heroin abuse intensified these effects, further reducing his ability to control his impulses and behavior. His condition was chronic.

Dr. Benson similarly opined that defendant was suffering from a mental defect and from a mental illness at the time of the commission of the

murders. His basic problems, which included an intermittent explosive personality disorder, organic personality disorder, persecutory delusional disorder, and cocaine-induced delirium, were aggravated by intoxication. Defendant was paranoid and delusional in the courtroom, and perceived "the Judge, the district attorney, his attorneys, [and] Dr. Pierce . . . as being against him."

## II. Competency and Self-representation Issues

### A. *Marsden Motions*

Defendant had his first appointed counsel removed after a *Marsden* motion. (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) Defendant made several subsequent *Marsden* motions before and during trial. He also on several occasions informally expressed displeasure with his counsel and asked for substitution. He states on appeal that "while the record of any particular *Marsden* motion does not by itself indicate a specific conflict between counsel and defendant, the record of the entire trial reveals an essential conflict between the defendant and his counsel resulting in a complete breakdown of the attorney-client relationship . . . . At the heart of the conflict was a fundamental disagreement as to the defense to be presented." As noted above, defendant wanted a defense of actual innocence and mistaken identity, whereas counsel pursued the defense that defendant acted impulsively, in part under the influence of drugs and alcohol, and lacked premeditation and deliberation.

Under the Sixth Amendment right to assistance of counsel " ' "[a] defendant is entitled to [substitute another appointed attorney] if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " (*People* v. *Memro* (1995) 11 Cal.4th 786, 857 [47 Cal.Rptr.2d 219, 905 P.2d 1305] (*Memro*).) Furthermore, " ' "When a defendant seeks to discharge appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance." ' " (*Ibid.*) "We review the court's rulings for an abuse of discretion." (*Ibid.*)

A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. (See *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1162 [259 Cal.Rptr. 701, 774 P.2d 730].) Tactical disagreements between the defendant and his attorney

do not by themselves constitute an "irreconcilable conflict." "When a defendant chooses to be represented by professional counsel, that counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." (*People* v. *Carpenter* (1997) 15 Cal.4th 312, 376 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

In the present case, trial counsel decided, in light of the overwhelming evidence against defendant on the question of his guilt for the six murders, to argue lack of premeditation. Counsel likely " 'was trying to enhance his credibility with the jury by [all but] conceding his client's guilt of the offense of which the evidence was overwhelming, and to focus his efforts on the weakest link in the state's case' " (*Memro, supra,* 11 Cal.4th at p. 858). That tactical choice was not ineffective representation on counsel's part. Defendant does not assert on appeal that the trial court failed to permit him adequate opportunity to present his *Marsden* motions. Nor, from our review of the record, is there evidence that counsel lacked diligence or competence in other respects. We conclude that the trial court did not abuse its discretion in denying defendant's various *Marsden* motions.

### B. *Denial of Faretta Motion*

A criminal defendant has a right to represent himself at trial under the Sixth Amendment to the United States Constitution. (*Faretta* v. *California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*); *People* v. *Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*).) A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. (*Faretta, supra,* at p. 835 [95 S.Ct. at p. 2541]; *People* v. *Gallego* (1990) 52 Cal.3d 115, 161 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1224-1225 [259 Cal.Rptr. 669, 774 P.2d 698].) Second, he must make his request unequivocally. (*Faretta, supra,* at p. 835 [95 S.Ct. at p. 2541]; *People* v. *Clark* (1992) 3 Cal.4th 41, 98 [10 Cal.Rptr.2d 554, 833 P.2d 561] (*Clark*).) Third, he must make his request within a reasonable time before trial. (*Marshall, supra,* at pp. 20-21; *Clark, supra,* at p. 98; *People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].) *Faretta* error is reversible per se. (*McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 177, fn. 8 [104 S.Ct. 944, 950, 79 L.Ed.2d 122] (*McKaskle*); *People* v. *Joseph* (1983) 34 Cal.3d 936, 948 [196 Cal.Rptr. 339, 671 P.2d 843].)

Defendant made a motion to represent himself on October 3, 1988, some three and one-half months before the start of jury selection. The matter was

continued and eventually came before the trial judge, Stanley Golde, on November 9, 1988, when defendant was given a *Faretta* questionnaire. The trial court on November 16, 1988, appointed Dr. Joseph Statten pursuant to Evidence Code section 730 to evaluate defendant on the sole issue of "whether he had the mental capacity to waive his constitutional right to counsel with a realization of the probable risks and consequences of his action." Defendant indicated that he would refuse to speak to Dr. Statten and apparently did not speak to him.

On November 21, 1988, the trial court denied defendant's motion to represent himself. It made extensive oral findings in support of its ruling and offered several reasons for denying the motion. The trial court initially stated:

"The question the Court has to decide is whether the defendant has the mental capacity to waive his constitutional right to counsel with a realization of the probable risks and the consequences of his action.

"The ability to waive must further be deemed to embody some minimal ability to present a personal, competent defense. If unable to present such effective defense, the defendant would lack capacity to stand trial without benefit of counsel even though the court finds and this court does find that he is capable of actually standing trial.

"This Court determines that the defendant is not mentally competent to waive counsel and represent himself for the following reasons: [¶] The defendant's mental condition in the Court's opinion precludes realistic assessment of the need for assistance and risk of waiving counsel. [¶] Mr. Welch alleges conspiracy between the parties to the judicial system. . . .[3]

"The Court—defendant further the Court finds engaged in court disruption. The defendant engages in verbal displays and interrupts and interferes

---

[3]In support of this finding, the trial court explained: "In the [*Marsden*] matter heard before Judge Ballachey, he alleges conspiracy, in these proceedings. I've listed just a few acts. [¶] On October 3rd . . . [he claimed] the Court, prosecution, and [his] counsel have been acting in collusion with each other. [¶] October 3rd . . . [he claimed] the [Alameda County] Bar Association should be disqualified from representing [him], being involved in a conspiracy. [¶] October 4th . . . there's an accusation of back-room discussion between counsel. [¶] October 4th . . . Mr. Welch accuses the defense attorneys [of] acting in collusion with the District Attorney's Office . . . . [¶] Further, he alleges in the [*Marsden*] proceedings before Judge Pulich—again, just a couple of examples. [¶] November 8th . . . [he] alleges a conspiracy between the judge, the District Attorney, police department, and court-appointed lawyers as well as the Public Defender and the police. . . . [¶] November 8th . . . he alleges the ballistic materials was [*sic*] falsified by the sheriff's department. [¶] November 8th . . . he alleges the jail officials were monitoring the interviews with psychologists by placing listening devices throughout the room."

with the conduct of the courtroom proceedings. He constantly interrupts the court and counsel."

In connection with that determination, the trial court relied not only on the preliminary proceedings that had been conducted before it, but also on defendant's conduct in the two *Marsden*-related hearings before two other judges. (See fn. 3, *ante*.) The trial court noted that in its presence, defendant accused the bailiff of tampering with his legal papers, asked the court to have his attorneys sit in the jury box due to a conflict of interest, was reluctant to respond to the court's questions while repeating that his civil rights were being abused, and interrupted the proceedings on the *Faretta* motion by requesting that the court and various individuals be served with a civil complaint in a federal matter.

Despite defendant's repeated interruptions in the course of the court's rendering of this part of its findings, the court further explained that defendant had in previous court appearances engaged in disruptive physical displays, made nonsensical motions, and stated his own inability to appear in court due to stress or mental breakdown, as well as his inability to proceed. The court noted that, despite defendant's having been granted the right to represent himself in a prior proceeding involving assault charges, subsequently during jury voir dire in that case, defendant had requested the reappointment of his attorneys because he allegedly had not adequately understood "the problems that would be incident to representing himself and realized it is imperative that he have competent attorney to represent him." A mistrial resulted in those prior proceedings, and a retrial was set to trail the trial of the present capital proceedings.

In the present case, after further interruptions by defendant, the trial court continued as follows: "I find Mr. Welch is a defendant who does not appreciate the extent of his own disability and, therefore, cannot be fully aware of the risk of self-representation. I find the disability of Mr. Welch significantly impairs his capacity to function in a courtroom. [¶] I further find that one of the defendant's reasons he wishes to dispense with [his] defense attorney is a paranoid distrust of everyone connected with the judicial system. This is further evidence to this court that he lacks the mental capacity to truly waive his right to counsel. [¶] Further, the defendant's history of improper if not irrational behavior in speaking in the courtroom in the *Marsden* hearing, 995 hearing further indicates doubt to this Court that he has the mental capacity to waive counsel. Further, as I have indicated, in [the case presently trailing the capital case], when given the opportunity to be his own attorney, he could not continue, asked for counsel."

After defendant interposed a request for advisory counsel pursuant to *Faretta*, the trial court denied the request, concluding: "You have failed in

your showing, and I have decided that a defendant facing the potential death sentence requires the assistance of competent counsel. You do not have the mental capacity to waive. [Defense counsel] are your attorneys."

Defendant contends that, having found defendant competent to stand trial, the trial court erred in imposing upon him a higher standard of competence to waive the assistance of counsel. As the United States Supreme Court has made clear, the two standards of competence are the same. (*Godinez* v. *Moran* (1993) 509 U.S. 389, 400-401 [113 S.Ct. 2680, 2687-2688, 125 L.Ed.2d 321] (*Godinez*).) In *Godinez*, the court rejected the proposition "that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights." (*Id.* at p. 399 [113 S.Ct. at p. 2686.) The high court further clarified by stating: "A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. [Citations.] In this sense there is a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of competence." (*Id.* at pp. 400-401 [113 S.Ct. at pp. 2687-2688], fn. & italics omitted.)[4] Accordingly, pursuant to the equivalent standards of mental competence to waive the right to the assistance of counsel and to stand trial, as set forth in *Godinez*, the trial court herein erred in its determination that a higher standard of competence to waive counsel applied and that defendant had not met that higher standard.

The trial court's determination set forth above reveals that it relied upon the circumstance that defendant was not competent to present an *adequate*

___

[4]At the time the trial court made its ruling in 1988, *Godinez* had not yet been decided. "Unlike statutory enactments, judicial decisions . . . are generally applied retroactively. [Citation.] But considerations of fairness and public policy may require that a decision be given only prospective application. [Citations.] Particular considerations relevant to the retroactivity determination include the reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule. [Citations.]" (*Woods* v. *Young* (1991) 53 Cal.3d 315, 330 [279 Cal.Rptr. 613, 807 P.2d 455].) In the criminal law, similarly, the rule is that "convictions should ordinarily be tested on appeal under the law then applicable, not the law prevailing at the time of trial." (*People* v. *Charles* (1967) 66 Cal.2d 330, 335 [57 Cal.Rptr. 745, 425 P.2d 545]; see *People* v. *Guerra* (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635].) We previously have applied the *Godinez* decision retroactively (see *People* v. *Bradford* (1997) 15 Cal.4th 1229, 1363-1364 [65 Cal.Rptr.2d 145, 939 P.2d 259]) and do so in the present case.

defense and therefore not competent to waive his right to the assistance of counsel—or did not knowingly and intelligently waive his right to such assistance. In *Faretta, supra*, 422 U.S. at page 835 [95 S.Ct. at page 2541], the high court stated: "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" It is apparent that several decisions contemporaneous to the trial court's ruling and considered by it concluded that *Faretta* had not eliminated the required evaluation of the *ability* of a defendant to represent himself or herself—either on the theory that such an evaluation properly was undertaken in assessing the defendant's competence to waive counsel, or in assessing the knowing and intelligent nature of defendant's waiver of counsel. (See, e.g., *People* v. *Burnett* (1987) 188 Cal.App.3d 1314, 1324-1325 [234 Cal.Rptr. 67] [concluding the rule in *Massey* v. *Moore* (1954) 348 U.S. 105, 108 [75 S.Ct. 145, 147, 99 L.Ed. 135], that competence to waive counsel includes the ability to present an elementary defense, survives *Faretta*; also declaring the existence of "a threshold of competence to present a defense below which one cannot genuinely realize the risk of doing so," and further declaring that "[a] *defendant who does not appreciate the extent of his own disability cannot be fully aware of the risk of self-representation where the disability significantly impairs his capacity to function in a courtroom*" (italics added)]; *People* v. *Manago* (1990) 220 Cal.App.3d 982, 986-988 [269 Cal.Rptr. 819] [applying the *Burnett* standards in the context of a *Faretta* motion, to conclude that an undereducated and inarticulate defendant lacked the minimal ability necessary for self-representation].)

 As the United States Supreme Court further clarified in *Godinez*, however, the trial court may not ascertain a defendant's competence to waive counsel by evaluating the *ability* to represent himself or herself. (*Godinez, supra*, 509 U.S. at pp. 399-400 [113 S.Ct. at pp. 2686-2687].) In explaining the difference between the competence and waiver requirements, the high court stated: "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. [Citation.] The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced. See *Faretta* v. *California, supra*, [422 U.S.] at [page] 835 [95 S.Ct. at page 2541] (defendant waiving counsel must be 'made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open"') . . . ; *Boykin* v. *Alabama* [(1989)] 395 U.S. [238,] 244

[89 S.Ct. 1709, 1712-1713, 23 L.Ed.2d 274] (defendant pleading guilty must have 'a full understanding of what the plea connotes and of its consequence')." (*Godinez, supra,* 509 U.S. at p. 401, fn. 12 [113 S.Ct. at pp. 2687-2688].)[5] ■■■ *Godinez* "explicitly forbids any attempt to measure a defendant's competency to waive the right to counsel by evaluating his ability to represent himself." (*U.S. v. Arlt* (9th Cir. 1994) 41 F.3d 516, 518.) When we examine, in light of the clarification of those standards offered in *Godinez,* the trial court's reliance upon the standard that defendant must possess some minimal ability to represent himself in order to be granted that right, it is apparent that the trial court erred in this respect as well.

Nonetheless, the trial court based its ruling upon the additional ground that defendant was disruptive. Defendant suggests that the trial court relied upon defendant's disruptive behavior *following* its ruling on the *Faretta* motion, and upon the trial court's mere conjecture that defendant might continue to be disruptive. It is clear, however, that the trial court also relied extensively upon the circumstance that defendant repeatedly had been disruptive during the course of the *Faretta* proceedings and during hearings on prior motions in the present case.

*Faretta* itself warned that a trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (*Faretta, supra,* 422 U.S. at pp. 834-835, fn. 46 [95 S.Ct. at p. 2541].) We assume the same rule applies to the denial of a motion for self-representation in the first instance when a defendant's conduct prior to the *Faretta* motion gives the trial court a reasonable basis for believing that his self-representation will create disruption. ■■ "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." (*Ibid.*) The high court reiterated this point in *McKaskle, supra,* 465 U.S. 168, noting "an accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel *and that he is able and willing to abide by rules of procedure and courtroom protocol.*" (*Id.* at p. 173 [104 S.Ct. at p. 948], italics added.) This rule is obviously critical to the viable functioning of the courtroom. A constantly disruptive defendant who represents himself, and who therefore cannot be removed from the trial proceedings as a sanction against disruption, would have the capacity to bring his trial to a standstill.

[5]In *Godinez, supra,* 509 U.S. at page 401, footnote 13 [113 S.Ct. at page 2688], the court stated: "We do not mean to suggest, of course, that a court is required to make a competency determination in every case in which a defendant seeks to plead guilty or to waive his right to counsel. As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence. [Citations.]"

■ Thus, a trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation. The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion "will not be disturbed in the absence of a strong showing of clear abuse." (*People* v. *Davis* (1987) 189 Cal.App.3d 1177, 1201 [234 Cal.Rptr. 859]; see also *Clark, supra,* 3 Cal.4th at p. 116 [decision to revoke self-representation status entitled to deference]; *McKaskle, supra,* 465 U.S. at pp. 177-178, fn. 8 [104 S.Ct. at pp. 950-951] [calling for "the usual deference" to the trial judge when making these "judgment calls"].) We see no reason not to use the same deference when it comes to deciding whether a defendant's motion for self-representation should be granted in the first instance.

■ Turning to the present case, we conclude that the trial court did not abuse its discretion in denying defendant's *Faretta* motion based on the disruptive behavior he had exhibited in the courtroom prior to making that motion. A review of the record of pretrial proceedings prior to deciding the *Faretta* motion does indeed reveal a number of instances in which defendant engaged in disruptive behavior: He belligerently denied awareness of a calendar date that was set in his presence; he turned his back on the trial court when addressing it; he interrupted the trial court several times to argue what the court had declared to be a nonmeritorious point; he accused the court of misleading him; he refused to allow the court to speak and he refused several times to follow the court's admonishment of silence. We are also aware that the extent of a defendant's disruptive behavior may not be fully evident from the cold record, and that one reason for according deference to the trial court is that it is in the best position to judge defendant's demeanor. Thus while no single one of the above incidents may have been sufficient by itself to warrant a denial of the right of self-representation, taken together they amount to a reasonable basis for the trial court's conclusion that defendant could not or would not conform his conduct to the rules of procedure and courtroom protocol, and that his self-representation would be unacceptably disruptive. We therefore conclude that the trial court did not abuse its discretion in denying the *Faretta* motion.[6]

---

[6]The trial court also suggested an additional reason for denying the *Faretta* motion. In a case that was trailing the present one, in which defendant was charged with burglary, preventing or dissuading a witness from testifying, and assault with force likely to produce great bodily injury, he initially had requested and had been granted the right to represent himself, but subsequently withdrew from self-representation after the jury panel had been sworn, causing delay in the trial. The trial court cited this incident in his denial of the *Faretta*

Defendant also contends that the trial court committed prejudicial error in authorizing a "hybrid" arrangement, whereby defendant, although represented by counsel, was allowed to make motions pro se each Friday morning. He cites our admonition that a trial court should not permit a defendant to participate as cocounsel except " 'on a substantial showing . . . that in the circumstances of the case the cause of justice will thereby be served and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered, or delayed.' " (*People* v. *Hamilton, supra,* 48 Cal.3d at p. 1162.) Defendant claims the court abused its discretion in this case by allowing him time to argue his own motions. But defendant does not show how he was prejudiced by such an arrangement, since these arguments occurred outside the presence of the jury.

It is true, as defendant points out, that he sought to present a different defense theory than his counsel and that therefore, defendant's testimony during the guilt phase of the trial may have been inconsistent with the case trial counsel sought to prepare. But such inconsistency was not caused by the hybrid arrangement chosen by the trial court. A defendant who does not qualify under *Faretta* for self-representation does not have the right to dictate strategy to his counsel. (See *People* v. *Hamilton, supra,* 48 Cal.3d at p. 1162.) Accordingly, we conclude that the persistent conflict between defendant and his trial counsel is not a basis for reversing defendant's conviction.

## C. *Trial Court's Failure to Declare a Doubt About Defendant's Competence*

Defendant contends that there was substantial evidence before the trial court indicating he was not competent to stand trial, and that therefore the trial court erred in not declaring a doubt as to his competence pursuant to section 1368, subdivision (a). Defendant asserts that the evidence presented to the trial court in the context of the *Faretta* hearing led it to determine that defendant was not competent to waive his right to counsel, and that, having made that determination, the court should have declared a doubt as to defendant's competence to stand trial and should have ordered a hearing to determine his competence pursuant to section 1368.

As reflected in the record described above, the trial court expressly found defendant competent to stand trial. We do not agree that, nonetheless, the evidence supporting the trial court's finding that defendant was incompetent to knowingly and intelligently waive his right to the assistance of counsel

motion. We need not and do not decide whether this incident, by itself, is sufficient to justify the denial of a *Faretta* motion.

does, or must be deemed to, constitute substantial evidence that defendant was incompetent to stand trial, or that the court's finding of incompetence to waive counsel as a matter of law must be equated with a finding of incompetence to stand trial.

In *Dusky* v. *United States* (1960) 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824], the United States Supreme Court defined competence to stand trial as a defendant's " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " *and* " 'a rational as well as factual understanding of the proceedings against him.' " As explained above, in *Godinez, supra*, 509 U.S. 389, the court defined competence to plead guilty or to waive the assistance of counsel, equating it with competence to stand trial. (*Id.* at p. 398 [113 S.Ct. at p. 2686].) In *Godinez*, the high court also stated that the standard for competence to plead guilty or to waive the assistance of counsel is not constitutionally required to be higher than or different from, the standard it enunciated in *Dusky* (509 U.S. at p. 398), and that although the states are free to adopt competence standards for waiving the assistance of counsel that are more elaborate than the *Dusky* formulation, "the Due Process clause of the federal Constitution does not so require." (509 U.S. at p. 402 [113 S.Ct. at p. 2688].)

Our state statute provides that a person is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (§ 1367.) Our state statutes do not separately define competence to waive the assistance of counsel.

Section 1368 provides in relevant part that "(a) If . . . a doubt arises in the mind of the trial judge as to the mental competence of the defendant, he or she shall state the doubt on the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings . . . to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time. [¶] (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing," and even if "counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing."

In *People* v. *Stankewitz* (1982) 32 Cal.3d 80, 91-92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476], we observed that even though section

1368 is phrased in terms of whether a doubt arises in the mind of the trial judge and is then confirmed by defense counsel, as this court recognized in *People* v. *Pennington* (1967) 66 Cal.2d 508, 516-517 [58 Cal.Rptr. 374, 426 P.2d 942], once the accused has come forward with *substantial evidence* of incompetence to stand trial, due process *requires* that a full competence hearing be held as a matter of right. (*Pate* v. *Robinson* (1966) 383 U.S. 375, 384-386 [86 S.Ct. 836, 841-843, 15 L.Ed.2d 815].) In that event, the trial judge has no discretion to exercise. (*People* v. *Pennington, supra*, 66 Cal.2d at pp. 518-519.) As we also have noted, substantial evidence of incompetence is sufficient to require a full competence hearing *even* if the evidence is in conflict. (*People* v. *Stankewitz, supra*, 32 Cal.3d at pp. 92-93.) We have concluded that where the substantial evidence test is satisfied and a full competence hearing is required but the trial court fails to hold one, the judgment must be reversed. (*Ibid.*)

"Substantial evidence" has been defined as evidence that raises a reasonable doubt concerning the defendant's competence to stand trial. (*People* v. *Frye* (1998) 18 Cal.4th 894, 951-952 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People* v. *Davis* (1995) 10 Cal.4th 463, 527 [41 Cal.Rptr.2d 826, 896 P.2d 119].) In *People* v. *Pennington, supra*, 66 Cal.2d at page 519, we enunciated the following standards regarding what would constitute substantial evidence of incompetence to stand trial: "If a psychiatrist or qualified psychologist [citation], who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied."

In the present case, neither defendant nor defense counsel presented substantial evidence of defendant's incompetence to stand trial.[7] Defendant contends nonetheless that the trial court, in giving its reasons for

---

[7]In fact, when the court informed defendant that he had ordered a psychiatrist to examine defendant prior to ruling on the *Faretta* motion, in order to evaluate defendant's competence to waive counsel, defendant personally objected, requesting that the court provide him with the name of the Penal Code section and points and authorities authorizing such an evaluation with regard to the issue of competence to waive counsel. When the court stated that it relied upon, and advised defendant to read, *People* v. *Burnett, supra*, 188 Cal.App.3d 1314, 1319 (determination by trial court that defendant was competent to waive counsel for hearing on restoration of sanity, made without benefit of psychiatric evidence, was error requiring reversal), defendant further asserted that such an order for a psychiatric examination was consistent with a section 1368 proceeding on competence to stand trial. Defendant personally inquired of the court what its basis was for ordering the examination of competence, since there had been "no outbursts" or "bizarre behavior," and there was "no substantial evidence before the court" justifying the psychiatric evaluation. Defense counsel then suggested

denying defendant's request for self-representation, itself acknowledged the presence of a prima facie showing of substantial evidence requiring that the court declare a doubt as to defendant's competence to stand trial and proceed to a hearing pursuant to section 1368. Defendant further contends that the trial court's failure to do so, despite having noted this substantial evidence, requires reversal of the judgment. Defendant relies specifically upon the trial court's findings regarding defendant's "paranoid distrust of the judicial system" and its related comments that defendant's beliefs in that regard disabled him from representing himself.

Viewed in light of the standard that the trial court believed applicable to the decision whether defendant could competently, knowingly, and intelligently waive the assistance of counsel, it is evident that the trial court found that defendant's disposition to distrust and to act contrary to the dictates of the judicial system amounted to a disability to represent himself *effectively*. The record is replete with instances demonstrating defendant's knowledge of case authority, courtroom procedure, and other aspects of legal representation. It is apparent that the trial court did not regard defendant's thoroughgoing distrust of the judicial system as an indication that defendant lacked " 'a rational as well as factual understanding of the proceedings against him' " or " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " (*Dusky* v. *United States, supra*, 362 U.S. at p. 402 [80 S.Ct. at p. 788]). Instead, the trial court viewed defendant's words and actions as evidence that he would not be willing to cooperate, compromise, or negotiate with the participants in that system, to the detriment of his legal representation.

In asserting that substantial evidence existed of his mental incapacity to stand trial, defendant also relies upon the psychiatric expert testimony presented by the defense at the penalty phase describing his considerable mental problems. ■■■ We review the correctness of the trial court's ruling at the time it was made, however, and not by reference to evidence produced at a later date. (See *People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669]; *People* v. *Greenberger* (1997) 58 Cal.App.4th 298, 336 [68 Cal.Rptr.2d 61].) The trial court did not have this evidence before it at the time of its ruling on the *Faretta* motion, and indeed did not have any expert evidence at that time because, having requested to represent himself, defendant refused to speak with a psychiatrist appointed to determine whether defendant was capable of self-representation.

---

"looking at" section 1368, following the ruling on the *Faretta* motion. We have stated that a trial court is not required to order a competence hearing based merely upon counsel's perception that his or her client may be incompetent. (*People* v. *Frye, supra*, 18 Cal.4th at p. 953.)

■■■ In view of these considerations, we may not conclude that the trial court's review of the evidence of defendant's competence at the hearing on the *Faretta* motion revealed substantial evidence of present incompetence that would trigger a duty on behalf of the court to declare a doubt as to defendant's competence to stand trial, and to institute competence proceedings under section 1368. Thus, the trial court was not required to declare a doubt on this basis as to defendant's competence to stand trial.

■■■ As described above, although we have determined that the trial court's failure, in a case in which substantial evidence of incompetence appears, to declare a doubt as to the defendant's ability to stand trial subjects the judgment to reversal, "[w]hen the evidence casting doubt on an accused's present sanity is less than substantial . . . only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed on appeal." (*People* v. *Pennington, supra*, 66 Cal.2d at p. 518; *People* v. *Merkouris* (1959) 52 Cal.2d 672, 678-679 [344 P.2d 1], disapproved on another point in *People* v. *Pennington, supra*, 66 Cal.2d at p. 518.) Therefore, we next decide whether a doubt as to defendant's sanity may be said to appear as a matter of law. If the trial court, in determining the competence of defendant to represent himself, in effect declared a doubt as to defendant's competence to stand trial, then doubt as to sanity *would* exist as a matter of law.

It was in 1988 that the trial court was presented with, and ruled upon, defendant's *Faretta* motion. At that time, the decisional law in this state held that mental competence to stand trial is not equated with competence to waive the assistance of counsel. (*People* v. *Burnett, supra*, 188 Cal.App.3d at p. 1321 ["[S]ince the standard for determining competence to stand trial is lower than the standard for determining competence to waive counsel, the fact that a person has been found mentally competent to stand trial with the assistance of counsel . . . therefore does not necessarily mean he or she is competent to waive the right to counsel and proceed to trial unassisted."]; *People* v. *Powell* (1986) 180 Cal.App.3d 469, 482-483 [225 Cal.Rptr. 703]; *People* v. *Leever* (1985) 173 Cal.App.3d 853, 864 [219 Cal.Rptr. 581]; *People* v. *Zatko* (1978) 80 Cal.App.3d 534, 541-543 [145 Cal.Rptr. 643]; see also *People* v. *Canfield* (1992) 2 Cal.App.4th 1357, 1361 [3 Cal.Rptr.2d 825] [finding the standard of competence to waive counsel not necessarily higher than, although "related but distinguishable" from, the standard of competence to stand trial]; 5 Witkin and Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2818, p. 3429; cf. *People* v. *Hightower* (1996) 41 Cal.App.4th 1108, 1114-1116 [49 Cal.Rptr.2d 40] [disapproving *Canfield, Burnett,* and other decisions in light of *Godinez*].)

As explained above, in 1993, in *Godinez, supra*, 509 U.S. 389, the high court clarified that under the federal due process clause, a defendant who

wishes to waive counsel need not be *more* competent than a defendant must be to stand trial or to waive other rights. It is appropriate to apply the *Godinez* decision retroactively to hold, as we have in the preceding discussion of the *Faretta* motion, that the trial court, having found defendant competent to stand trial, erred in determining nonetheless that defendant was not sufficiently competent to waive his right to the assistance of counsel. (As discussed above, we uphold the trial court's denial of defendant's motion to represent himself, on grounds other than his competence to do so.)

We may *not*, however, also apply the *Godinez* decision retroactively to conclude that because the trial court found defendant incompetent to waive counsel in ruling on the *Faretta* motion, it necessarily also had a doubt, or should have had a doubt, as to his competence to stand trial and should have conducted a competence hearing pursuant to section 1368. Two reasons preclude such a holding.

First, to do so in effect would *elevate* the standard of mental capacity to stand trial to the higher level of mental capacity that the trial court obviously believed necessary for defendant to be permitted to represent himself. The trial court specifically stated that it found defendant competent to stand trial. As we have seen, the trial court's discussion of defendant's competence in the context of the *Faretta* motion, relied upon by defendant to establish substantial evidence of incompetence to stand trial, emphasizes the court's determination that defendant was not capable of presenting an *adequate* defense. Although the trial court erred in requiring that defendant possess some minimal legal ability in order to be allowed to represent himself, that error precludes our equating its findings regarding "competence" in that sense, with findings regarding competence to stand trial—because it is clear the trial court applied a standard of *actual* competence to represent oneself that was higher than that deemed necessary for competence to stand trial.

Additionally, as explained above, the trial court's examination of defendant's competence in the context of the *Faretta* motion suggests it was simultaneously examining whether defendant had a "realization of the probable risks and consequences of his action," that is, whether "the waiver of his constitutional rights is knowing and voluntary." (*Godinez, supra*, 509 U.S. at p. 400 [113 S.Ct. at p. 2687].) Because the trial court's findings clearly suggest that the court was assessing these additional factors, its ultimate determination that defendant was not competent to represent himself reflected a more demanding standard and a wider set of factors than was appropriate for the determination of defendant's competence to stand trial.

Second, for us to apply the *Godinez* decision simultaneously to conclude that the trial court erred in imposing upon defendant an elevated standard of

competence to waive the assistance of counsel, *and* that the trial court erred in failing to declare a doubt as to defendant's competence to stand trial based upon its own erroneously elevated standard of competence, would be to improperly derive two distinct conclusions of error from a single erroneous determination.

 Accordingly, we may not conclude as a matter of law that the trial court's determination that defendant was incompetent to waive his right to the assistance of counsel must be equated with a determination that a doubt existed as to defendant's competence to stand trial. Thus, we next consider whether the trial court abused its discretion in declining to declare a doubt as to defendant's competence to stand trial, in light of the evidence before it.

 When the evidence casting doubt on an accused's present competence is less than substantial, the following rules govern the application of section 1368. It is within the discretion of the trial judge whether to order a competence hearing. When the trial court's declaration of a doubt is discretionary, it is clear that "more is required to raise a doubt than mere bizarre actions (*People* v. *Kroeger* (1964) 61 Cal.2d 236, 243-244 . . .) or bizarre statements (*People* v. *Williams* (1965) 235 Cal.App.2d 389, 398 . . .) or statements of defense counsel that defendant is incapable of cooperating in his defense (*People* v. *Dailey* (1959) 175 Cal.App.2d 101, 108-109 . . .) or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense (*People* v. *Jensen* [(1954)] 43 Cal.2d 572, 579)." (*People* v. *Laudermilk* (1967) 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228].) In the present case, the circumstances noted by the court—that defendant and his counsel did not agree on which defense to employ, and that defendant had a paranoid distrust of the judicial system and had stated his counsel was in league with the prosecution—while suggesting the trial court *could have* ordered a hearing on competence to stand trial, do not establish that the trial court *abused its discretion* in failing to do so, justifying reversal on that basis.

For all of these reasons, we conclude that the trial court's determination that defendant was incompetent to knowingly and intelligently waive his right to the assistance of counsel may not be equated with a determination that a doubt existed as to defendant's competence to stand trial. We conclude that the trial court's findings in determining that defendant was incompetent to waive counsel do not constitute substantial evidence of defendant's incompetence to stand trial, mandating a hearing under section 1368. We also conclude that the trial court did not abuse its discretion in not declaring a doubt as to defendant's competence to stand trial.

Defendant urges that, at this juncture, his trial counsel rendered ineffective assistance of counsel by failing to seek a determination of his client's competence to stand trial. A defendant who asserts he has received ineffective assistance of counsel must establish both that "counsel's representation fell below an objective standard of reasonableness" and that the defendant suffered prejudice as a result. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688, 693-694 [104 S.Ct. 2052, 2064, 2067-2068, 80 L.Ed.2d 674].) In the present case, prior to determination of the *Faretta* motion, defense counsel referred to the possibility of pursuing a motion pursuant to section 1368. The trial court subsequently specifically remarked that it found defendant competent to stand trial. In view of the circumstances that the trial court was not required to order a competence hearing based merely upon counsel's perception that his or her client may be incompetent to stand trial (*People* v. *Frye*, *supra*, 18 Cal.4th at p. 953), as well as the absence of substantial evidence of defendant's incompetence, defendant cannot establish prejudice from the failure of his attorney to seek a determination of defendant's competence.

Defendant, citing *Ake* v. *Oklahoma* (1985) 470 U.S. 68, 82-83 [105 S.Ct. 1087, 1095-1096, 84 L.Ed.2d 53] (requiring that access to psychiatric assistance be provided to indigent defendants upon a threshold showing that it will be necessary for an adequate defense or that insanity will be an issue), urges that the failure to offer psychiatric evidence of defendant's incompetence denied him his constitutional right to psychiatric assistance. As is apparent, defendant was afforded access to psychiatric assistance.

### III. Jury Selection/Venue Issues

#### A. *Change of Venue Motion*

 The defense moved for a change of venue prior to voir dire of prospective jurors, claiming that due to extensive pretrial publicity, defendant would not be able to obtain a fair trial in Alameda County. In support of this motion, it called Joie B. Hubbert, a venue specialist, who testified that a poll she had conducted disclosed that 65 percent of jury-eligible individuals in Alameda County had heard of the case, and that of those approximately 78 percent, or about 50 percent of all those polled, had prejudged defendant to be guilty. The trial court denied the motion, but left open the possibility that it would reconsider the motion after voir dire was completed. The defense[8] renewed the motion after voir dire and the trial court again denied it. Defendant now contends that the trial court erred.

---

[8] In this opinion, we dispense with the usual convention of attributing the actions of defense counsel to the defendant, since in this case the actions and opinions of defendant and his

■ A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. "Whether raised on petition for writ of mandate or on appeal from a judgment of conviction, 'the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable.' " (*People* v. *Douglas* (1990) 50 Cal.3d 468, 495 [268 Cal.Rptr. 126, 788 P.2d 640].) "The de novo standard of review applies to our consideration of the five relevant factors: (1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim." (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1236-1237 [283 Cal.Rptr. 144, 812 P.2d 163].)

■ Applying these factors to the present case, we conclude that the trial court did not err in refusing to grant the change of venue motion. The first factor, the nature and gravity of the offense, does indeed weigh in favor of granting the motion. The other factors do not. Although the media coverage was substantial at the time of the murders, two years had passed by the time that the change of venue motion was made. " 'Through the passage of time, any potential prejudice was thereby significantly reduced.' " (*People* v. *Sully*, *supra*, 53 Cal.3d at p. 1237.) Defendant was a resident of the community, not an outsider, and there was no racial motivation for the crime that would augment its inflammatory nature. (See *People* v. *Williams* (1989) 48 Cal.3d 1112, 1129 [259 Cal.Rptr. 473, 774 P.2d 146].) In addition, Alameda County is the sixth largest in the state, "with a geographically dispersed and economically diverse population" (*Sully*, *supra*, 53 Cal.3d at p. 1237 [referring to San Mateo County, the eleventh most populous in the state].)

The evidence weighing most heavily in favor of the change of venue is Hubbert's testimony that 62 percent of the potential jury pool had heard of the case and 50 percent had prejudged defendant guilty. But the import of this evidence is diminished by the fact that, according to jury questionnaires, less than 10 percent of the actual prospective jurors in this case (29 out of 294) reported any recollection of the case. Defendant argues that the only way to account for this discrepancy between the survey results and responses of the actual jury pool regarding recollection of the case is that the members of the jury pool must have been underreporting their recollection of the case and would have recalled it if their recollection had been refreshed. But based

counsel so frequently diverged. For example, defendant rather than his counsel frequently made objections to various remarks and testimony, and it would be misleading to state "defendant failed to object" when in fact defendant did object but his counsel did not. We generally reserve the term "defendant" to refer to defendant personally at trial, or to defendant generally as appellant in this appeal. Otherwise, we will refer to "the defense" or "trial counsel" or "counsel."

on the present record, we cannot draw such an inference. The voir dire process confirmed what the above factors suggest: that in a county as large and diverse as Alameda County, it was feasible to obtain an unbiased jury and a fair trial despite the pretrial publicity the crime received. We therefore conclude the trial court did not err in refusing to grant the defense request for a change of venue.

### B. *Wheeler/Batson Motion*

Defendant is Black. Three of the jurors were Black, as were two alternates. The prosecution exercised three of its eleven peremptory challenges to excuse Black prospective jurors, and a fourth peremptory to exclude a Black prospective alternate juror. The defense objected, based on the rule of *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], and *Batson* v. *Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69], that the prosecution excluded these prospective jurors on the basis of group bias, in violation of defendant's right to trial by jury under article I, section 16 of the California Constitution, and of his right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. The trial court stated that it did not believe defendant had made a prima facie case under *Wheeler*, but nonetheless invited the prosecutor "if you want to for the record" to explain the reasons for excluding the prospective Black jurors. The prosecutor obliged, and at the end of his explanation the trial court ruled that no prima facie showing of group bias had been made, therefore denying the *Wheeler/Batson* motion. Defendant now claims the trial court erred.

"Under *Wheeler* and *Batson*, ' "[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group . . . . Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association." ' [Citations.] [¶] If the trial court finds that [he] has established a prima facie case, the burden shifts to [his opponent] to provide 'a race-neutral explanation related to the particular case to be tried' for the peremptory challenge." (*People* v. *Turner* (1994) 8 Cal.4th 137, 164-165 [8 Cal.4th 440a, 32 Cal.Rptr.2d 762, 878 P.2d 521], italics omitted.) When a trial court, after a *Wheeler/Batson* motion has been made, requests the prosecution to justify its peremptory challenges, then the question whether defendant has made a prima facie showing is either considered moot (see *Hernandez* v.

*New York* (1991) 500 U.S. 352, 359 [111 S.Ct. 1859, 1866, 114 L.Ed.2d 395]) or a finding of a prima facie showing is considered implicit in the request (*People* v. *Fuentes* (1991) 54 Cal.3d 707, 715-716 [286 Cal.Rptr. 792, 818 P.2d 75]). But when, as here, the trial court states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for purposes of completing the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied. (*Turner, supra,* 8 Cal.4th at p. 167.) When the trial court under these circumstances rules that no prima facie case has been made, "the reviewing court considers the entire record of voir dire. [Citation.] 'If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question,' " we reject the challenge. (*People* v. *Davenport* (1995) 11 Cal.4th 1171, 1200 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

 After examining the record as a whole, we affirm the trial court's ruling that defendant failed to make a prima facie showing of *Wheeler/ Batson* error. The fact that there were three Black jurors and two Black alternates seated at the time the trial court ruled on the motion, while not conclusive, weighs in favor of finding no prima facie showing. So too does the fact that the prosecution exercised only three of its eleven peremptory challenges on Black prospective jurors. Finally, even assuming a prima facie challenge had been made, the race-neutral explanations proffered by the prosecutor appear plausible and supported by the record. The prosecutor had questions about the credibility of Ladonna Y., who had said she had no children during voir dire but who, according to a bailiff, had a child seated on her lap in the jury room. Theresa H. struck the prosecutor as mentally slow, and the record is not inconsistent with that impression. Gerald G. expressed considerable reservations about imposing the death penalty. Prospective alternate juror Carl A. expressed initial reservations about the death penalty. In short, the record suggests race-neutral grounds upon which the prosecutor might reasonably have excused the prospective jurors in question.

## C. *Excusal of Jurors for Cause*

 Defendant contends the trial court improperly excused three prospective jurors because of their views regarding the death penalty.

"A prospective juror may be excused for cause if his or her views on capital punishment would ' "prevent or substantially impair the performance of his [or her] duties as a juror . . . ." ' [Citations.] Where a prospective juror's responses are equivocal or conflicting, the trial court's assessment of the juror's state of mind is generally binding. Where there is no inconsistency, but simply a question whether the juror's responses demonstrated a

bias for or against the death penalty, the trial court's judgment will not be set aside if it is supported by substantial evidence." (*People* v. *Wash* (1993) 6 Cal.4th 215, 254 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

Defendant claims that the trial court erroneously excused prospective juror Martin Gilens, although he stated that he could vote for the death penalty "if I felt it was appropriate." However, when the court asked the next question, "Could you ever see yourself feeling death to be appropriate?" He stated, "I don't know." His response was at best equivocal; we cannot say the trial court erred.

Defendant also claims that the trial court erroneously excused prospective juror Howard Gruber simply because "he had reservations about the death penalty." But his responses went beyond mere reservations, calling into question his ability to perform his duty as a juror in a capital case. When asked whether he "would be able to impose death if [he] felt that was the proper punishment" he stated, "I'm not sure I could do that." The trial court did not err in excusing this prospective juror for cause.

The third excusal for which defendant claims error is for prospective juror Victoria Brown. When asked if she could ever impose the death penalty, her responses were "I don't know" and "I'm not sure." The trial court did not err in excusing prospective juror Brown.

## IV. Guilt Phase Issues

### A. *Seizure of Weapons From Backyard of Hideout*

 As recounted above, defendant and Rita Lewis sought shelter at the house of his second cousin Beverly Jermany at approximately 5:30 a.m. on December 8, 1986, shortly after he committed the murders. Later that morning, the police conducted a search of Jermany's backyard pursuant to a consent-to-search form she had executed at 8:46 a.m. They found the Uzi, the Smith and Wesson, and the Taurus defendant used to commit the murders, in a pillowcase in the backyard. Before trial, defendant moved to suppress this evidence. The trial court denied the motion on the grounds that Jermany had validly consented to the search, that defendant lacked standing to assert her Fourth Amendment rights, and that the pillowcase had in any event been within plain view. Defendant now contends the trial court erred. We disagree.

" 'An illegal search or seizure violates the federal constitutional rights only of those who have a legitimate expectation of privacy in the invaded

place or seized thing.' [Citation.]" (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1171 [9 Cal.Rptr.2d 834, 832 P.2d 146].) "A valid consent to search eliminates the need for either a warrant or probable cause. . . . [¶] The person in control of the premises may consent to a search thereof." (*People* v. *Reed* (1967) 252 Cal.App.2d 994, 995-996 [61 Cal.Rptr. 60].)

Defendant cites *Minnesota* v. *Olson* (1990) 495 U.S. 91, 96-97 [110 S.Ct. 1684, 1688, 109 L.Ed.2d 85], for the proposition that the "status as an overnight guest is alone enough to show that [a person] had an expectation of privacy in the home that society is prepared to recognize as reasonable." But even if we assume, arguendo, that defendant was an "overnight guest," *Olson* does not support his position. That case did not involve a situation in which the overnight guest's host consented to the search, and does not suggest that the host's consent to a search may not a render lawful a search of the host's house or a seizure therefrom. Indeed, the *Olson* court premised its holding regarding the privacy expectations of houseguests on the observation that "[t]he houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. . . . The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objections of the guest." (*Id.* at p. 99 [110 S.Ct. at p. 1689].) In the present case, defendant's "host" unambiguously consented to the search.

Defendant cites *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 69 [27 Cal.Rptr. 889, 378 P.2d 113], which held that "one joint occupant who is away from the premises may not authorize police officers to enter and search the premises over the objection of another joint occupant who is present at the time, at least where . . . no prior warning is given, no emergency exists and the officer fails even to disclose his purpose to the occupant who is present or to inform him that he has the consent of the absent occupant to enter." Defendant, however, was in no sense a joint occupant, but rather a transient guest, a critical difference in defining his expectation of privacy. We conclude that Jermany's consent rendered the search of her backyard lawful.

B. *Admission of Accomplice's Hearsay Statement*

As recounted, defendant and Lewis sought refuge at the house of Beverly Jermany. Jermany testified that Lewis had told her as they were helping defendant inside the house that she had accidentally shot him. Trial counsel objected that her testimony was inadmissible hearsay. The prosecutor claimed the statement was admissible as that of a coconspirator. The objection was overruled. Jermany also testified that, after she told Lewis she

could not bring drugs into the house, Lewis said that a pillowcase she was carrying into the house did not contain drugs. An objection to the admissibility of this statement on grounds of hearsay was also overruled.

Defendant now claims that the trial court committed error, violating the state law prohibition against hearsay as well as the confrontation clause of the Sixth Amendment to United States Constitution. Whether or not properly admissible, however, neither Lewis's statement that she had shot defendant nor her statement that the pillowcase did not contain drugs was remotely prejudicial to defendant's case. There was independent and uncontradicted evidence that the pillowcase contained the murder weapons, and indeed that defendant had committed the six murders. The admission of these statements was therefore not prejudicial error.

### C. *Introduction of Evidence That Defendant Was a Drug Dealer*

■ During the examination of Leslie Morgan, one of the witnesses to the murders, the prosecutor asked whether defendant was employed. Morgan answered that he was, and, when asked about defendant's employment, stated that it was "selling drugs." Trial counsel timely objected that this testimony was irrelevant and highly prejudicial character evidence in violation of Evidence Code section 1101, subdivision (a), which states that, subject to certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Counsel then moved for a mistrial. The trial court denied the motion.

The People contend, on the other hand, that evidence that defendant was employed as a drug dealer tends to negate evidence that he acted impulsively in committing the murders, and therefore the evidence was admissible under Evidence Code section 1101, subdivision (b), which states, inter alia, that "[n]othing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as . . . intent . . .) other than his or her disposition to commit such an act."

"Generally [a] trial judge has discretion to grant or deny [a motion for a mistrial], and will grant it on determining that a party's chances of receiving a fair trial have been irreparably damaged." (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 181, p. 208.) In the present case, the trial court did not abuse its discretion in denying a motion for a mistrial. Whether or not the introduction of such evidence violated Evidence Code section 1101, it was

not prejudicial, that is, it is not reasonably probable that a result more favorable to defendant would have resulted absent admission of this evidence. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The jury had before it virtually uncontradicted evidence not only that defendant had engaged in six murders and two attempted murders, but also that he had engaged in numerous instances of terrorizing and harassing his victims and other people. The fact that the jury learned that defendant was also a drug dealer was inconsequential.[9]

### D. Trial Court's Comment on Defendant's Absence From the Courtroom

The trial court ordered defendant removed from the courtroom a number of times because of his disruptive behavior. On some of these occasions, the court remarked that defendant "could not stop the trial." Defendant now contends that the trial court's comments prejudiced the jury and deprived him of a fair trial. Specifically, he argues that the remarks would be interpreted by the jury as implying that he was trying to stop the proceedings because he knew he was guilty and would be convicted. Defendant reads too much into the trial court's brief explanation of his removal. Moreover, the jury was admonished that this disruptive behavior "cannot [be taken into consideration] in determining the guilt or innocence of the defendant." The trial court did nothing improper.

### E. Admission of Autopsy Photographs

The defense moved to prevent the admission of autopsy photographs of the murder victims as unduly prejudicial. Defendant now claims that admission of some of the photographs was reversible error. In determining whether the prejudice from admission of such photographs outweighs its probative value under Evidence Code section 352, a trial court "enjoys broad discretion." (*Memro, supra,* 11 Cal.4th at p. 866.)

In this case, the trial court appeared to carefully consider the photographs proffered by the prosecution, admitting some and excluding others. The primary issue during the guilt phase was whether defendant had the requisite deliberation and premeditation to be convicted of first degree murder. The trial court admitted autopsy photographs as evidence that defendant possessed these mental states when he committed the murders. With these

---

[9]Defendant also contends that his Eighth Amendment rights were violated because the trial court had instructed the jury at the penalty phase that it could consider all guilt phase evidence, and hence the jury might have considered evidence that defendant was a drug dealer in choosing a capital sentence. Again, in light of all the evidence weighing against defendant at both the guilt and penalty phases, we find the introduction of such evidence to be harmless error, if any error there be, under any standard.

photographs the pathologist could illustrate, as well as explain, the nature of the wounds, to indicate that the killing had been done at close range and in a deliberate manner. (See *Memro, supra*, 11 Cal.4th at pp. 866-867 [photographs of children "killed in a ghastly manner" admissible to show malice].) Moreover, the photographs of the upper chest wounds to Dellane Mabrey corroborated Leslie Morgan's testimony that defendant shot her in the chest while she pleaded with him. Furthermore, a reasonable jury would be able to distinguish between the wounds inflicted from the murder and the disfigurement caused by the autopsy. (See *id.* at p. 866.) We therefore conclude that the trial court did not abuse its discretion in determining that the probative value of the photographs outweighed their prejudicial effect.

F. *Ineffective Assistance of Counsel for Failing to Introduce Psychiatric Evidence at the Guilt Phase*

 As discussed, trial counsel put on a guilt phase defense that consisted primarily of attempting to cast doubt on whether defendant had premeditated and deliberated prior to committing the murders, and was therefore guilty only of second degree murder. Specifically, counsel tried to show that defendant had been unable to form the requisite mental state because of the use of alcohol, cocaine, and heroin shortly before the murders. Counsel presented two medical doctors to testify in general about the mental impairments caused by these substances individually and in combination. The defense did not present any psychiatric testimony at the guilt phase, reserving such testimony for the penalty phase. Defendant now claims that counsel rendered ineffective assistance in failing to introduce the psychiatric testimony during the guilt phase, in violation of his right to counsel under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution.

 To establish ineffective assistance of counsel, "a defendant must show that: (1) the representation fell below an objective standard of reasonableness under prevailing professional norms," and (2) prejudice resulted, "i.e., that absent counsel's failings a more favorable result would have been probable." (*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1339 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

In evaluating whether defendant has demonstrated inadequate performance, "we accord great deference to the tactical decisions of trial counsel in order to avoid 'second-guessing counsel's tactics and chilling vigorous advocacy.' " (*In re Fields* (1990) 51 Cal.3d 1063, 1069 [275 Cal.Rptr. 384, 800 P.2d 862].) In the present case, we conclude defendant has not carried his burden of showing inadequate performance. Two psychiatrists,

Drs. Benson and Pierce, both testified at the penalty phase regarding defendant's general mental disturbances, including his paranoia and poor impulse control. We disagree with defendant that it was inadequate performance not to introduce such testimony at the guilt phase of the trial. It was reasonable for counsel to conclude that such testimony would not be effective at that point. Given the fact of the six murders and all the evidence that defendant had indeed deliberated, counsel could have reasonably decided that generalized psychiatric testimony would have been unhelpful or counterproductive, and that it was proper to focus the psychiatric testimony at the guilt phase on defendant's intoxication at the time of the murders.

Moreover, defendant cannot carry his burden of showing that such a strategy resulted in prejudice. Indeed, since the psychiatric testimony did not sway the jury to choose life imprisonment without possibility of parole at the penalty phase, it is unlikely that confronting the same jury with the same evidence at the guilt phase would have caused them to vote for second degree murder over first degree murder.

G. *Prosecutorial Misconduct During Guilt Phase Closing Argument and Related Ineffective Assistance Claims*

Defendant asserts that the prosecutor committed several acts of misconduct during closing argument that deprived him of a fair trial, in violation of the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution.

██ Defendant asserts that the prosecutor committed misconduct by disparaging trial counsel's credibility. The prosecutor at one point referred to the contradiction in the defense—that on the one hand, defendant testified that he did not commit the murders, and on the other, trial counsel tried to prove that defendant did not premeditate and deliberate. The prosecutor stated: "So, the basic defense is I'm not guilty because I wasn't there. But if you find me there and don't believe me, it is only second-degree murder because of my mental delusions and mental impairment . . . . Remember that. Remember that. They want it both ways." Trial counsel objected in a timely manner that the argument was improper.

When a defendant makes a timely objection to prosecutorial argument, the reviewing court must determine first whether misconduct has occurred, keeping in mind that " '[t]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom' " (*People v. Sims* (1993) 5 Cal.4th 405, 463 [20 Cal.Rptr.2d 537, 853 P.2d 992]), and that the prosecutor "may 'vigorously argue his case'

. . . , '[using] appropriate epithets warranted by the evidence.' " (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144].) Second, if misconduct had occurred, we determine whether it is "reasonably probable that a result more favorable to the defendant would have occurred" absent the misconduct. (*People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) It is misconduct when a prosecutor in closing argument "denigrat[es] counsel instead of the evidence. Personal attacks on opposing counsel are improper and irrelevant to the issues." (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 184 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Here we find the prosecutor did not commit misconduct in making the above statements. It is no misconduct to pointedly highlight, as the prosecutor did here, the contradictions in a defendant's case. (See *People* v. *Clark* (1993) 5 Cal.4th 950, 1029-1030 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

Defendant also contends the prosecutor committed misconduct when he compared him to Ramon Salcido, a notorious multiple murderer whose trial occurred around the same time as his. Trial counsel did not object to this remark at trial. Therefore, defendant did not preserve the misconduct claim on appeal "unless an objection would have been futile or an admonition ineffective." (*People* v. *Arias* (1996) 13 Cal.4th 92, 159 [51 Cal.Rptr.2d 770, 913 P.2d 980].) In this case, an admonition would have cured any harm. (See *People* v. *Bloom, supra,* 48 Cal.3d at p. 1213.) Nor can we conclude that the remarks were prejudicial in light of the evidence against defendant.

Next, defendant asserts that certain statements to which he personally objected at trial relating to the impact of the crime on the victims were improper. During closing argument, trial counsel recounted how he had thought of his closing argument during a barbecue for one of his children. The prosecutor, referring to that theme, stated: "[Counsel] likes to pamper his daughter, and that really gave me a chill, because consider this. I'm sure Dellane would have loved to pamper Valencia. I'm sure she would have liked to have grown with her. Valencia will never be pampered again, ladies and gentlemen. Dellane can't pamper her and Valencia can't be pampered, because neither of them have all their heads left. Moochie took care of that." Defendant contends that such remarks were an unlawful appeal to the jury's passions and prejudices (see *People* v. *Fields* (1983) 35 Cal.3d 329, 362-363 [197 Cal.Rptr. 803, 673 P.2d 680]). Trial counsel failed to object and the claim is therefore not preserved on appeal. Nor can we conclude that the remarks were prejudicial in light of the evidence against defendant.

Defendant also claims that failure to object in the above instances constituted ineffective assistance of counsel. Counsel stated on the record that his failure to object to the prosecutor's inflammatory statements was "a

matter of trial strategy." Counsel's decision was well within the bounds of professional norms. He could reasonably have determined that the risks of raising the objection and offending or annoying the jury outweighed whatever benefit might have been obtained from prosecutorial remarks that were little likely to prejudice his client. Therefore we find no ineffective assistance.

Defendant also contends that counsel should have objected to the prosecutor's remarks that counsel had been unable to make the "hard choice" regarding his guilt or innocence, a play on counsel's statement in closing remarks regarding the "hard choice" the jury faced between first and second degree murder. But such argument was, again, not a disparagement of counsel but a pointed assertion of the inconsistency of the defense, and was not misconduct. It was therefore not ineffective assistance of counsel for failure to object.

### H. *Ineffective Assistance During Opening and Closing Arguments*

■ Defendant contends that trial counsel rendered ineffective assistance during the opening statement and closing arguments, as well as in his redirect examination of defendant when the latter testified at trial. We disagree.

Trial counsel's brief opening statement came after an emotional opening statement by the prosecutor emphasizing the magnitude of the crimes committed, characterizing the crimes as Oakland's "day of infamy" occurring almost 45 years to the day after the bombing of Pearl Harbor. Trial counsel's opening statement emphasized putting emotion aside and deciding the case based on the evidence. It also told the jury "to pay particular attention to the evidence that bears . . . on mental state and mental frame of mind." Defendant contends that this opening statement was unfocused and inadequate, that it did not adequately set forth the second degree murder theory that was the primary basis of trial counsel's defense. But even assuming arguendo that counsel's performance in this regard was deficient, we cannot say that it was demonstrably detrimental to his client, and therefore cannot conclude that it constituted ineffective assistance of counsel.

Defendant criticizes trial counsel's closing argument in part because he all but conceded his guilt as to the commission of the six murders. In the face of overwhelming evidence that defendant in fact committed these murders, counsel had little choice, and indeed, a contrary approach may well have been untenable. (See *Memro, supra,* 11 Cal.4th at p. 858 [concession of guilt and focusing on "weak link" in the prosecution's case may be a valid tactic when evidence of guilt is overwhelming].)

Defendant also criticizes trial counsel for failing to adequately set forth his second degree murder defense. We disagree. Trial counsel competently argued to the jury that defendant's consumption of alcohol and drugs impaired his mental state and led to an impulsive killing that did not rise to the level of premeditation and deliberation necessary for first degree murder. He called the jury's attention to the evidence of defendant's intoxication, and to the expert testimony regarding the effects such intoxication would likely have on judgment and impulse control. Given the state of evidence in the case, such argument did not constitute deficient performance.

Defendant also claims that trial counsel rendered ineffective assistance during defendant's testimony. He testified over trial counsel's protest that he needed time to talk to him to determine what questions to ask. Denied that, trial counsel asked general questions about the crime, during which defendant related his version of what had happened. On cross-examination, the incredibility of defendant's version of events and his claim of mistaken identity was brought fully to light. On redirect, trial counsel allowed defendant to testify in an open-ended fashion, asking if there "was an area of testimony . . . about which you would like to tell." Defendant now contends that this tactic, as well as trial counsel's statements that he and defendant had not discussed defendant's testimony ahead of time, constituted ineffective assistance. We disagree. Although counsel was opposed to defendant's testifying, he cooperated as best he could, while at the same time subtly distancing himself from defendant so that he would not be tainted by defendant's own lack of credibility. Such conduct was not deficient performance.

## I. First Degree Murder Instructions

Defendant claims that the trial court erred in giving several instructions that departed from standard CALJIC instructions. First, he claims the trial court misled the jury regarding the difference between second degree murder and manslaughter by instructing the jury that malice "is expressed where there is manifested an intention *to unlawfully kill* a human being," rather than, as in CALJIC No. 8.11, "*unlawfully to kill* a human being." We disagree. We fail to see how the splitting of the infinitive could have given rise to confusion.

Nor would the jury have been misled about the difference between manslaughter and murder, as the defendant also claims, by the trial court's further clarification of the express malice instruction: "In other words, express malice is where the activity shows an intent to kill." Read in context with the trial court's delivery of the standard instruction on express malice,

and of its subsequent definition of implied malice, this statement is reasonably understood as merely further clarifying for the jury the difference between express and implied malice. Moreover, because no manslaughter instruction was given and no evidence supported such instruction, the likelihood of jury confusion over second degree murder and manslaughter was nil.

Defendant also objects to the trial court's nonstandard instruction with respect to deliberation. The trial court gave the standard instruction patterned after CALJIC No. 8.20 on premeditation, stating inter alia: "A cold, calculated judgment and decision may be arrived at in a short period of time; but a mere unconsidered and rash impulse, even though it included an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing, the reasons for and against such choice and, having in mind the consequences, he decides to and does kill." The trial court then added: "In other words, ladies and gentlemen, . . . deliberation means that you think about it. It's a reasoning process. It can either be good or bad reasoning. You think of what you're going to do before you do it instead of acting upon a sudden impulse or something else which precludes the idea of thought."

Defendant contends that this instruction "blurs the distinction between first-degree and second-degree murder by making first-degree murder virtually tantamount to performed intent to kill, which is only second-degree murder." We disagree. Taken in context, the trial court's instruction merely clarifies the basic concept that deliberate and premeditated murder requires some quantum of reflection greater than a mere intent to kill.

Defendant also contends that the above instruction was "misleading in this case, where there was evidence that defendant's 'bad reasoning' was a product of alcohol, cocaine and heroin use or some other medical condition, which should have been considered as a defense to the charge of deliberate murder, not evidence supportive of that charge." But again, considered in its proper context, no such confusion was likely, because the trial court also instructed the jury properly on the place of voluntary intoxication in mitigating culpability for a homicide: "Our law provides that no act committed by a person while in a state of voluntary intoxication by either drugs or alcohol is less criminal by reason of his having been in such condition . . . . In the crime of murder, however, a necessary element is the existence in the mind of the defendant of the specific mental state which we just talked about [i.e. deliberation and premeditation] . . . . If the evidence shows the defendant was intoxicated at the time of the offense, you may consider his state of

intoxication, if any, in determining if the defendant had such required mental states." Given this subsequent instruction, there is no reason to suppose that the jury would think that the trial court's reference to "bad reasoning" while defining premeditation and deliberation was a reference to reasoning impaired by voluntary intoxication.

Defendant further claims that the voluntary intoxication instruction quoted above was not sufficiently specific, and the jury might have been unclear as to what the trial court referred when it stated "you may consider his state of intoxication, if any, in determining that defendant had such required mental states." But given that this injunction was preceded by a reference "to the specific mental state which we just talked about" and given that the trial court had just instructed on premeditation and deliberation, such confusion is exceedingly unlikely. ■ Moreover, " ' " '[i]f the court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request the *additional or qualifying instruction* in order to have the error reviewed.' " ' " (*Weeks* v. *Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1162 [74 Cal.Rptr.2d 510], italics in original.) Trial counsel failed to do so here.

Defendant further claims that the jury should have received an instruction on voluntary manslaughter. But the trial court was under no duty to give such instruction when, as here, no credible evidence supported it. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

## J. *Refusal to Modify Flight Instruction*

■ The trial court instructed the jury as follows: "Now, the flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt; but it is a fact which, if proved, may be considered by you in the light of all other proved facts in determining the question of his guilt or innocence." Defendant requested a sentence be added to the instruction: "While this inference of guilt goes to identity it does not tell us anything about degree." The trial court refused. Defendant contends that this was error, "in violation of his right to due process and reliable death judgment under the federal constitution."

The trial court committed no error in refusing this modification to the standard flight instruction, which accurately conveys the potential significance of flight. "[T]he flight instruction '[does] not address the defendant's mental state at the time of the offense and [does] not direct or compel the drawing of impermissible inferences in regard thereto.' " (*People* v. *Nicolaus* (1991) 54 Cal.3d 551, 579-580 [286 Cal.Rptr. 628, 817 P.2d 893].)

### K. Sufficiency of Evidence of Premeditation and Deliberation

 Defendant contends there is insufficient evidence of premeditation and deliberation to support the first degree murder verdicts. **(35)** "When considering the claim of a criminal defendant that a verdict was not supported by sufficient evidence, 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 955 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

 This court has previously identified three types of evidence used to sustain a finding of premeditation and deliberation. These are: " '(1) facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' " (*People* v. *Hawkins*, *supra*, 10 Cal.4th at p. 956, quoting *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) As we have stated, these guidelines "were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case." (*Hawkins*, *supra*, 10 Cal.4th at p. 957.)

 In the present case, all three types of evidence were amply present. There is evidence of planning, chiefly numerous statements defendant made to the victims and others that he was planning to kill everybody in the Mabrey house a few hours before doing so. He had also obtained a semiautomatic weapon for the purpose of carrying out the killing. There was also evidence of several motives: the desire to prevent Barbara Mabrey and others in the house from testifying against him about his harassment of them, his animus towards Barbara for interfering with his relationship with Dellane, his jealousy directed at Dellane for her relationship with Leslie Morgan, and his belief that someone in the Mabrey family had stolen his dog. As

for the manner of killing, he systematically moved through the Mabrey household, killing or attempting to kill everyone in it, shooting them in the head or chest at close range. In the case of Dellane, he straddled her body after he had shot her once and shot her again. We therefore find defendant's claim of insufficient evidence of premeditation and deliberation to be without merit.

## V. PENALTY PHASE ISSUES

### A. Threat to Kill Correctional Officers

The prosecution introduced as evidence in aggravation, under the category of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" (§ 190.3, factor (b)), defendant's assault on Alameda County Sheriff's Deputy Charles Utvick while the latter was in the process of transporting him to court in 1987. Utvick testified that immediately after this incident, defendant stated that he would kill one of Utvick's fellow deputies, or have him killed, "and he would have the rest of us taken care of as well." Defendant now objects to the admission of that statement, to which trial counsel timely objected. Defendant points out that this threat was not alleged as a separate incident in aggravation and is insufficiently connected with the Utvick assault to warrant admission. Defendant further contends that this kind of idle threat, made while he was handcuffed and shackled, was merely an expression of frustration and not the type of evidence admissible under the "express or implied threat to use force or violence" clause of section 190.3, factor (b). He claims both state law error and violation of his Eighth Amendment rights as an unreliable determination of penalty. We disagree. As we stated in *People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741], "[v]iolent 'criminal activity' presented in aggravation may be shown in context, so that the jury has full opportunity, in deciding the appropriate penalty, to determine its seriousness." Here, defendant's remarks were clearly relevant to the context in which Utvick's assault occurred.

### B. Prosecutorial Misconduct During Penalty Phase Closing Argument

Defendant claims numerous instances of prosecutorial misconduct during the penalty phase closing argument. Trial counsel failed to object to any of the alleged instances of misconduct and therefore failed to preserve these claims on appeal unless a timely objection would have failed to cure the harm. (*People* v. *Arias, supra,* 13 Cal.4th at p. 159.) Because defendant also claims that the failure to object to these alleged instances of prosecutorial

misconduct amounted to ineffective assistance of counsel, we will consider the merits.

### 1. *Boyd Error*

 The prosecutor stated, in the context of explaining the process of weighing aggravating and mitigating factors: "And Judge Golde will tell you any other circumstances which extenuates the gravity of the crime. And I'm kind of still waiting to hear what those might be." Defendant contends that the prosecutor's argument improperly suggested to the jury that there was no mitigating evidence and that the jury could consider this fact as an aggravating circumstance. This he claims was a violation of the principle stated in *People* v. *Boyd* (1985) 38 Cal.3d 762, 774 [215 Cal.Rptr. 1, 700 P.2d 782] that evidence admitted in aggravation must be "relevant to those factors" set out in section 190.3. We disagree. Here, the prosecutor argued in effect that the mitigating evidence presented by defendant be given little or no weight. (See *People* v. *Jackson* (1996) 13 Cal.4th 1164, 1241 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Such form of argument is not misconduct. (*Ibid.*)

Defendant also claims *Boyd* error occurred when the prosecutor referred in closing argument to testimony that he had urinated in a courtroom well during a trial and in a J.C. Penney's fitting room when apprehended for shoplifting—forms of misconduct that do not fit within any of the statutory aggravating factors enumerated under section 190.3. The prosecutor mentioned these incidents in the context of a discussion of defendant's assaults on a correctional officer, during which defendant threw feces at the officer. He concluded his discussion with a comment: "Isn't it real cute? See how he handles his waste products." These remarks did not exceed the bounds of permissible prosecutorial argument. (See *People* v. *Sims*, *supra*, 5 Cal.4th at p. 463.)

### 2. *The Prosecutor's Reference Concerning Those Whom Defendant Hates*

During closing argument the prosecutor attempted to counter defendant's claim that he had poor impulse control and therefore was in some way not fully responsible for his actions. The prosecutor surmised that because defendant hated authority figures, he likely hated many of the people present in the court, including the prosecutor himself, the judge, his own counsel, and the bailiff, but that he was able nonetheless to restrain himself in court from committing violence against these people. He inferred from this fact that defendant's commission of violence was calculated and self-serving rather than the result of poor impulse control. Defendant contends that the

prosecutor was using the supposition of his hatred of authority figures as an additional nonstatutory aggravating factor. But it is clear from the above context that the prosecutor's remarks in this regard were for the proper purpose of addressing defendant's mitigation evidence, and did not suggest that the jury exceed the bounds of the aggravating factors enumerated in section 190.3.

### 3. *Future Dangerousness*

■ Defendant claims that the prosecutor committed misconduct by arguing that he would be dangerous to fellow inmates and others with whom he came in contact if he were given a sentence of life imprisonment without possibility of parole. Specifically, he argued that defendant demonstrated "sodomy urges," that he endangered other inmates and that his violent behavior would "jeopardize the health and safety of any guards, visitors, social workers, inmates or clergy who may come into contact with him." As we have stated: "It is settled that argument concerning a defendant's future dangerousness as a life prisoner is proper where it is based on evidence of past crimes admitted under one or more statutory factors in aggravation." (*People* v. *Millwee* (1998) 18 Cal.4th 96, 153 [74 Cal.Rptr.2d 418, 954 P.2d 990].) In this case, as reviewed above, there is ample evidence of defendant's violent past, including numerous assaults on prison and jail officials and the commission of sodomy. The prosecutor's argument regarding defendant's future dangerousness, based on this history of violence, was not misconduct.

### 4. *Religious Sanction for the Death Penalty*

■ Stating that he wanted to alleviate the jury's "pang of conscience," the prosecutor read various passages from the Bible apparently sanctioning capital punishment, including Exodus, chapter 21, verse 12, which states, "He that smiteth a man, so that he die, shall be surely put to death." ■ As we have recently reiterated, "an appeal to religious authority in support of the death penalty is improper because it tends to diminish the jury's personal sense of responsibility for the verdict. [Citations.] Such argument also carries the potential the jury will believe a higher law should be applied and ignore the trial court's instructions." (*People* v. *Hill* (1998) 17 Cal.4th 800, 836-837 [72 Cal.Rptr.2d 656, 952 P.2d 673].) ■ We note that the prosecutor "was not responding to a defense argument invoking religious authority." (*Id.* at p. 837.) Nor was he referring to religious authority in order exhort the jury not to resort to "religious canons to decide the appropriate penalty." (*People* v. *Arias, supra,* 13 Cal.4th at p. 180.) On the contrary, the prosecutor was using biblical references in part to assuage the jury's sense of personal responsibility.

Moreover, the prosecutor then asked the jury to imagine defendant's meeting in some supposed afterlife with the two children whom he murdered, who "will be whole" and will "look at the [defendant] and before the final witnesses . . . will say but two words, two words. 'Why, Moochie.' " This otherworldly account of retribution, following as it did the biblical approval of the death penalty, further reinforces the notion that some higher law favors or requires the death penalty against defendant. The fostering of this notion has no place at the penalty phase of a capital trial. (*People* v. *Hill, supra,* 17 Cal.4th at p. 837.)

Nonetheless, the prosecutor's misconduct in this instance was not prejudicial. Most of his argument was taken up with a discussion of the murders that defendant committed, as well as his numerous violent prior offenses, both charged and uncharged, and the lack of mitigation. Toward the conclusion of his argument the prosecutor stated: "Now you all swore to me personally in [the] jury selection process . . . that each of you, if you found that the aggravating circumstances substantially outweighed the mitigating circumstances, which we have absolutely shown here to be true, . . . could return a death penalty verdict, and you 12 are the ones to make this choice." Moreover, defense's closing argument adequately apprised the jury of its responsibility under California law. Given the magnitude of penalty phase evidence against defendant, the relatively minor place of the religious argument in the closing argument as a whole, and the balancing effect of the defense in closing argument, there is no reasonable possibility that the jury would have chosen the lesser verdict if it had not heard the prosecution's religious references. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) It was also harmless beyond a reasonable doubt. (*Chapman* v. *California* (1968) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].)

### 5. *Caldwell Error*

■ Defendant complains of the following portion of the prosecutor's closing argument: "You are jurors in this case and were selected to render an opinion as to the appropriate penalty. Don't forget that. An opinion. You're not the grim reaper executioners. You are not going to be over there at San Quentin dropping pellets, strapping people in. That is not your function. You are a juror and you are to advise the court what is the appropriate penalty." Defendant claims this form of argument violated his Eighth Amendment rights, because, by using the terms "advise" and "opinion," it impermissibly undermined the jury's sense of responsibility for making the proper penalty determination, by suggesting that the responsibility lies with the court. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 330 [105 S.Ct. 2633, 2640, 86

L.Ed.2d 231]; see also *People* v. *Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669].) But the prosecutor's use of these terms was, at most, ambiguous. As explained above, the prosecutor elsewhere made clear that the jury's sentencing decision was an exercise of personal responsibility. No reasonable juror, after hearing the rest of the prosecutor's argument, the defendant's argument, and the trial court's instructions, would have been mistaken as to the jury's role as the arbiter of defendant's fate.

### 6. *Prosecution's Alleged Comment on Defendant's Lack of Remorse*

During closing argument, the prosecution recounted testimony of the rape and sodomy of Jaunell T., recalling that defendant attempted to interrupt the testimony out of supposed concerned for upsetting the witness. The prosecutor stated: "Well I almost choked on that one." Shortly thereafter, the prosecutor stated in reference to this incident: "This is a true sociopath, one who puts his feelings over all else. The bottom line is David Moochie Welch, I'm first." Defendant interprets these remarks as a general prosecutorial comment on lack of remorse, which he claims violates his Eighth Amendment rights to a reliable penalty determination. He also claims a violation of his Fifth Amendment rights, because the remarks implicitly penalized defendant for failing to testify during the penalty phase. (See *Brooks* v. *Tennessee* (1972) 406 U.S. 605, 610 [92 S.Ct. 1891, 1894, 32 L.Ed.2d 358].)

We conclude that the prosecutor did not commit misconduct. He was merely commenting on the sodomy and rape incident, as well as numerous other incidents introduced into evidence, which showed defendant's disregard for others. Such remarks were within the bounds of the "wide latitude" given to prosecutors during closing argument. (*People* v. *Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Moreover, the prosecutor never suggested that lack of remorse was an independent aggravating factor. (See *People* v. *Fierro* (1991) 1 Cal.4th 173, 224 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) Nor did the prosecutor suggest that the jury should consider the fact that defendant did not testify at the penalty phase. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 209 [5 Cal.Rptr.2d 796, 825 P.2d 781].) We conclude that the prosecutor did not commit misconduct through the above remarks, and that defendant's Fifth and Eighth Amendment rights were not violated.

### C. *Ineffective Assistance of Counsel During the Penalty Phase*

Defendant's ineffective assistance claims during the penalty phase are of two different types. First, defendant claims that trial counsel's failure to object to the alleged prosecutorial misconduct constituted ineffective assistance. As reviewed above, none of these alleged instances, except one, had

merit. The one bona fide instance of misconduct—the use of biblical references—was not prejudicial, and defense counsel could have legitimately decided that it was tactically wise not to interrupt the prosecutor but to respond to the use of religious references during his own closing argument, as he in fact did. We therefore find no ineffective assistance for failing to object to the prosecutor's closing argument.

Second, defendant claims that trial counsel's own closing argument was deficient and prejudicial. We disagree. During the penalty phase, the defense strategy was to call two mental health experts to establish that defendant's culpability was mitigated because his crimes were committed while under the influence of extreme mental or emotional disturbance (§ 190.3, factor (d)) and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication (§ 190.3, factor (h)). From the present record, it does not appear that this psychiatric focus was itself strategically or tactically unsound.

Defendant points to the fact that trial counsel called him "crazy" during closing argument as an instance of ineffective assistance.[10] Read in context, however, the use of that resonant colloquial term appears to have been an attempt to move beyond legalisms to appeal to the jury's likely perception that there was something psychologically quite wrong with defendant. Use of the term was followed by discussion of statutory mitigating factors and reasoned argument about how defendant's "craziness" fit into these factors. Trial counsel did not commit ineffective assistance in this regard.

During closing argument trial counsel also stated: "The fact that [defendant] doesn't have any humanity doesn't surprise me. He doesn't have the mind to have humanity. By that I mean a mind that is free from mental illness. He hasn't had it for the whole year that I have been dealing with him. He hasn't had it for all the years he has been alive up to an early point he hasn't. Why should he have it?" Defendant faults counsel for speaking of him as lacking "humanity." But as appears from the context, counsel was

---

[10]Counsel stated: "I think, Ladies and Gentlemen, if you analyze [defendant's] history, that is to say from the beginning, from his youth, to the present time, you will see a continuum of mental disorders. You will see ample, ample, ample evidence of mental disorders.

"The psychiatrist and psychologist give it a name. Right. They call it he's suffering from delusions. He's suffering from lack of control. He's suffering from a paranoia, belief that things are happening when they're not.

"The simple thing, Ladies and Gentlemen, is there really any one of you who doesn't think that my client is crazy?

"Really? Is there any one of you who sits there and who honestly can say that they don't think Mr. Welch is crazy?"

equating defendant's supposed lack of humanity with mental illness, in an attempt to turn to his client's advantage the jury's probable perception that defendant had few visible redeeming features. This argument did not constitute ineffective assistance.

Defendant also faults trial counsel for calling attention to the fact that he was uncooperative during trial. Counsel indeed noted how unusual it was, in his 30 years of practice, to have a client who was so uncooperative with his attorney. But this discussion was, again, in the context of a larger discussion of defendant's mental problems. These remarks served to further underscore the self-defeating behavior in which defendant continually engaged, a theme that was emphasized in the psychiatric testimony. This discussion was therefore consistent with trial counsel's reasonable penalty phase strategy.

Defendant claims ineffective assistance of counsel because of remarks made during counsel's explanation of why he had replaced Dr. Rosenthal, the chief psychiatric expert during the guilt phase, with Dr. Benson and Dr. Pierce. Counsel told the jury that during the guilt phase he had put on psychiatric testimony that was not inconsistent with the position of actual innocence that defendant maintained, but that at the penalty phase he could introduce psychiatric testimony premised on the supposition that defendant did in fact commit the crimes. Defendant now claims that such an argument undercut counsel's credibility with the jury, suggesting that he had been less than honest with the jury at the guilt phase. He also contends that this admission also cast him in a less favorable light. As to this latter point, it is doubtful indeed that counsel's remarks could have further reduced defendant's already much diminished stature and credibility before the jury. Nor did the remark likely undercut counsel's own standing with the jury. Rather, counsel competently explained to the jury the reason for the change in psychiatric experts between the guilt and penalty phases, a change that the prosecutor had claimed was suspect. These remarks did not constitute ineffective assistance.

D. *Failure to Give Instruction Regarding Deterrent Value and Monetary Cost of Death Penalty*

Defendant claims the trial court erred in refusing his instruction to the jury not to consider the deterrent effect of the death penalty or the monetary costs of executing a prisoner versus maintaining him in prison for life without possibility of parole. In rejecting the instruction, the trial court reasoned that the instruction might backfire and cause the jury to consider matters it would otherwise have ignored. We have noted that a jury was similarly instructed in *People* v. *Ray* (1996) 13 Cal.4th 313, 355, and

footnote 22 [52 Cal.Rptr.2d 296, 914 P.2d 846]. While instructing the jury on this point may be appropriate in some cases, it was not error for the trial court to refuse such an instruction. The jury was adequately informed that it was supposed to limit itself to the statutory aggravating and mitigating circumstances in making its penalty determination. The prosecutor never attempted to comment or introduce evidence regarding issues of cost and deterrence. The trial court was not required to furnish an instruction exhorting the jury to refrain from considering factors which, under a reasonable understanding of the jury instructions, it should have known were improper to consider.

### E. *Reasonable Doubt Instruction for Other Crimes Evidence*

 The trial court instructed the jury that any "factor in aggravation must be proved beyond a reasonable doubt." It also instructed that it was to accept as being conclusively proven that defendant had been convicted of three prior felonies—assault with force likely to produce great bodily injury, battery of a peace officer, and receipt of stolen property. Defendant now contends that the jury would have been confused by this instruction into believing that the *conduct underlying* these convictions had been conclusively proven, and that the prosecution was not required to prove such conduct beyond a reasonable doubt in order for that conduct to count against defendant as violent criminal activity.

In fact, the trial court misstated the law, but did so to defendant's benefit. It is untrue that all factors in aggravation must be proven beyond a reasonable doubt; only unadjudicated violent criminal activity must be so proven. (*People* v. *Samayoa* (1997) 15 Cal.4th 795, 862 [64 Cal.Rptr.2d 400, 938 P.2d 2].) When reviewing a supposedly ambiguous jury instruction, " 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*People* v. *Frye, supra,* 18 Cal.4th at p. 957.) In the present case the jury was instructed as to each instance of unadjudicated violent criminal activity charged by the prosecution, and was instructed that it had to believe this beyond a reasonable doubt in order to count the other crimes against defendant in the sentencing process. There was no reasonable likelihood that the jury would have misunderstood to defendant's detriment the scope of this reasonable doubt instruction.

### F. *Failure of California Death Penalty Statute to Narrow Class of Death Eligible Murders*

 As we have stated: "As construed by the United States Supreme Court, the Eighth Amendment requires that a death penalty law 'rationally

distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not' (*Spaziano* v. *Florida* (1984) 468 U.S. 447, 460 [104 S.Ct. 3154, 3162, 82 L.Ed.2d 340]), and establish 'rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold.' (*McCleskey* v. *Kemp* (1987) 481 U.S. 279, 305 [107 S.Ct. 1756, 1774, 95 L.Ed.2d 262].)" (*People* v. *Holt* (1997) 15 Cal.4th 619, 697 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Defendant contends that the California death penalty statute, because of the inclusiveness of the special circumstances categories, makes virtually all murderers eligible for the death penalty and therefore fails to measure up to the constitutional standard articulated above. We have repeatedly rejected this claim (see *People* v. *Holt, supra,* 15 Cal.4th 619, 698, and cases cited therein) and continue to do so.

G. *Failure to Give Burden of Proof and Standard of Proof Instructions*

Defendant contends that the California death penalty statute is unconstitutional under the Eighth Amendment of the United States Constitution inasmuch as it fails to provide the jury with instructions on the burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination. We have repeatedly rejected such an argument. ▇▇▇ "Unlike the determination of guilt, 'the sentencing function is inherently moral and normative, not factual' [citation] and thus 'not susceptible to a burden-of-proof quantification.'" (*People* v. *Sanchez* (1995) 12 Cal.4th 1, 81 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) We have therefore rejected arguments that the imposition of a reasonable doubt standard on the jury's finding of aggravating factors, or the finding that the aggravating factors substantially outweigh mitigating ones, is constitutionally required. (*Id.* at pp. 80-81.) For much the same reason, we have concluded that "neither the prosecution nor the defense has the burden of proof" during the penalty phase. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 890 [277 Cal.Rptr. 122, 802 P.2d 906].) We decline to revisit these decisions. Nor do we agree with defendant that, in the absence of a specific instruction, the jury is likely to believe that it is bound by the reasonable doubt instruction given during the guilt phase in deciding whether evidence can count in defendant's favor as mitigating. On the contrary, because the trial court instructed specifically that the reasonable doubt standard applied (partially erroneously) to aggravating factors, and mentioned nothing about mitigating factors, the reasonable juror would infer that no such reasonable doubt standard applied to mitigating factors.

Defendant further contends that as a matter of statutory construction section 190.3 should be interpreted as implicitly incorporating Evidence

Code section 115, which provides in part: "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." Defendant also claims that section 190.3 should also be read to include Evidence Code section 500, which states that "[e]xcept as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." These two provisions, he argues, place the burden on the prosecution to prove aggravating circumstances at the penalty phase.

There is no reason to believe that section 190.3 was intended to incorporate Evidence Code section 115. Indeed, the final paragraph of section 190.3 makes clear the sui generis nature of the jury's penalty phase determination: "After having heard and received all the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." Because section 190.3 describes a process of sentencing determination that is basically incompatible with burden of proof quantification (see *People* v. *Sanchez, supra,* 12 Cal.4th at p. 81), it is most reasonable to infer that section 190.3 either is simply outside the scope of Evidence Code section 115, which was not intended to apply to such sentencing matters, or else fits within the latter statute's "otherwise provided by law" exception. The same would be the case with the relationship between section 190.3 and Evidence Code section 500.

H. *Failure to Give Burden of Proof Instruction for Unadjudicated Criminal Activity*

The jury was instructed that before it could consider any unadjudicated violent criminal activity as an aggravating circumstance, it had to be satisfied "beyond a reasonable doubt that defendant did, in fact, commit such criminal activity . . . ." Defendant contends that the trial court erred in failing to instruct the jury sua sponte that he was presumed innocent and that the prosecution had the burden of proof. We have held that no such instruction is required, and that the court fulfills its obligation in this regard when it instructs the jury on the reasonable doubt standard. (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1090-1091 [36 Cal.Rptr.2d 235, 885 P.2d 1].) We decline to reconsider the matter, under either state or federal constitutional theories.

I. *Unconstitutionality of Section 190.3, Factor (d)*

The jury was instructed, in accordance with section 190.3, factor (d), to consider "whether or not the offense was committed while the defendant was

under the influence of extreme mental or emotional disturbance." Defendant claims that such an instruction is unconstitutional because it precludes the jury from considering all mitigating factors, and in particular mitigating evidence of a mental or emotional disturbance that is less than extreme. ▮ We have rejected that argument, explaining that "the 'catchall' provisions in section 190.3, factor (k), 'referring to "[a]ny other circumstance which extenuates the gravity of the crime," allow consideration of nonextreme mental or emotional conditions.' " (*People* v. *Turner, supra,* 8 Cal.4th at p. 208.) We decline to revisit this question.

### J. *"Double Counting" of Section 190.3, Factor (a)*

The jury was instructed to consider "[t]he circumstances of the crime of which the defendant was convicted in the proceeding and the existence of any special circumstance found to be true." (See CALJIC No. 8.85.) As in *People* v. *Cain* (1995) 10 Cal.4th 1, 68 [40 Cal.Rptr.2d 481, 892 P.2d 1224], defendant contends "the court was obliged, on its own motion, to instruct the jury not to 'double count' the same facts as circumstances of the crime and as special circumstances." As we stated in *Cain,* "We have repeatedly rejected claims of reversible error in this regard where the defense did not request an instruction against double counting, and there was no misleading argument by the prosecutor suggesting the same facts should be weighed twice, once under each rubric." (*Ibid.*) In the present case, there was neither a defense request nor any misleading prosecutorial argument on the point.

### K. *Failure to Instruct Jury That Unanimity Is Not Required to Consider Mitigating Factors*

Defendant contends that the trial court erred in failing to instruct the jury sua sponte that it did not need unanimity in order to consider particular mitigating evidence. ▮ As we recognized in *People* v. *Breaux* (1991) 1 Cal.4th 281, 314 [3 Cal.Rptr.2d 81, 821 P.2d 585], "[i]t is settled that a *requirement* of unanimity improperly limits consideration of mitigating evidence." (Original italics.) As we also noted in *Breaux,* nothing in the standard California jury instructions "suggest[s] that any particular number of jurors was required to find a mitigating circumstance. The only requirement of unanimity was for the verdict itself." (*Id.* at p. 315.) The instructions also conveyed unmistakably that jurors were to undergo an individualized process of weighing aggravating and mitigating factors. We conclude, as in *Breaux,* that there was little likelihood of the jury's reading into the instructions a requirement that they agree unanimously on any circumstance or evidence as mitigating.

## L. *Failure to Instruct Regarding Nonviolent Criminal Activity*

██ The jury was instructed to "take into account and be guided by the following factors in aggravation and mitigation" and then was read each of the factors enumerated in section 190.3. When it came to factor (b), the jury was instructed as to each of the violent criminal acts that the prosecution sought to prove against defendant. The jury was instructed: "Now, evidence has been introduced for the purpose of showing that the defendant has committed the following criminal activity which involve the express or implied use of force or violence or the threat of force [or] violence. Before you may consider any such criminal acts or activity as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal activity or acts."

Defendant points to the fact that during the penalty phase both the prosecution and the defense introduced evidence of incidents of unadjudicated criminal activity not involving violence, as well as evidence concerning various juvenile adjudications. He then claims it was a violation of the Eighth Amendment to fail to explicitly instruct the jury that it could not consider these nonviolent acts or juvenile adjudications, interjecting "a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." (*Beck* v. *Alabama* (1980) 447 U.S. 625, 643 [100 S.Ct. 2382, 2392, 65 L.Ed.2d 392].) But the instruction, read in a context in which it was clear that the court was setting forth the *only factors* that could be considered in aggravation and mitigation, and then setting forth the exclusive list of incidents that could be considered in deciding whether defendant had been guilty of past violent criminal activity, left little if any likelihood that the jurors would misunderstand the proper limits of their inquiry. We therefore find no instructional error and no constitutional violation.

## M. *Lack of Instruction on Defendant's Failure to Testify at Penalty Phase*

Defendant did not testify at the penalty phase of the trial. The trial court did not instruct sua sponte regarding the fact that the jury was to draw no negative inferences from this failure to testify. As defendant recognizes, we have held that the trial court has no duty under the Fifth Amendment of the United States Constitution or any other constitutional provision to furnish such instruction sua sponte. (*People* v. *Hardy*, *supra*, 2 Cal.4th at p. 209.) We decline his request to reexamine this question.

## N. *Illegal Method of Execution*

At the time defendant was sentenced to death, the method of execution in this state was by lethal gas. Subsequently, this method of execution was

found to be cruel and unusual. (*Fierro* v. *Gomez* (N.D.Cal. 1994) 865 F.Supp. 1387, affd. by *Fierro* v. *Gomez* (9th Cir. 1996) 77 F.3d 301, 309.) The United States Supreme Court granted certiorari in *Fierro*, vacated the judgment, and remanded the case to the United States Court of Appeals for the Ninth Circuit "for further consideration in light of . . . [s]ection 3604." (*Gomez* v. *Fierro* (1996) 519 U.S. 918 [117 S.Ct. 285, 136 L.Ed.2d 204].) Section 3604, subdivision (b), as amended in 1996, permits an election by persons sentenced to death to have punishment imposed by either lethal gas or lethal injection. As we have noted, the constitutionality of the method of execution "bears solely on the legality of the execution of the sentence and not on the validity of the sentence itself." (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1110 [25 Cal.Rptr.2d 867, 864 P.2d 40], fn. omitted.)

Defendant argues nonetheless that the supposed unconstitutionality of the execution by lethal gas directly affected his penalty verdict. As he states: "Since retribution rather than deterrence appears to be the prevailing justification for modern capital punishment systems, it is unsurprising that a juror's assessment of the harshness of punishment becomes one of the sentencing factors . . . . Thus, some jurors in defendant's trial may have concluded that painful death by gas was a more appropriate punishment than life in prison. But the same jurors could have easily concluded that life in prison was harsher and more appropriate [than] a medically administered injection similar to those contemplated by proponents of state assisted suicide laws . . . . Defendant is entitled to a new sentencing hearing because the method of execution envisioned by defendant's sentencing jury has been found unconstitutional."

Of course, the argument could be made that it is at least as likely that the adoption of lethal injection as a method of execution has made juries more, rather than less, willing to select a death sentence. In any case, when reviewing a jury verdict, "[w]e presume that jurors comprehend and accept the court's directions." (*People* v. *Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84].) Defendant's speculation about the jury's decisionmaking process does not serve to dispel that presumption in the present case. We therefore presume that the method of execution did not play a role in the jury's penalty phase deliberations.

O. *Other Constitutional Objections to the Death Penalty Statute*

In addition to the constitutional claims discussed above, defendant raises a number of other constitutional objections to the death penalty statute identical to those we have previously rejected. These include the failure of the death penalty statute to distinguish between aggravating and mitigating

circumstances (*People* v. *Bradford* (1997) 14 Cal.4th 1005, 1059 [60 Cal.Rptr.2d 225, 929 P.2d 544]); the failure of the death penalty statute to require written findings from the jury as to which aggravating factors are found to be true (*People* v. *Montiel* (1993) 5 Cal.4th 877, 943 [21 Cal.Rptr.2d 705, 855 P.2d 1277]); the lack of intercase proportionality review (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 812 [60 Cal.Rptr.2d 1, 928 P.2d 485]); the inclusion of unadjudicated violent criminal activity as a factor in aggravation (*People* v. *Garceau* (1993) 6 Cal.4th 140, 198-199 [24 Cal.Rptr.2d 664, 862 P.2d 664]); the lack of a requirement of a unanimous finding that the defendant committed prior unadjudicated criminal activity before that factor is considered in aggravation (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 153 [36 Cal.Rptr.2d 474, 885 P.2d 887]); the supposed vagueness of the terms "extreme" and "substantial" found in section 190.3, factors (d) and (g) (*People* v. *Stanley* (1995) 10 Cal.4th 764, 842 [42 Cal.Rptr.2d 543, 897 P.2d 481]); the lack of any curb on the prosecutor's discretion in determining whether or not to seek the death penalty (*People* v. *Arias, supra,* 13 Cal.4th at p. 189); and the methods of execution (*People* v. *Bradford, supra,* 14 Cal.4th at p. 1059). We decline to reconsider our holdings as to these constitutional questions.

 Defendant also contends that the standard jury instruction regarding mitigating factors[11] is generally inadequate to define mitigation. He advances this claim not by focusing on any particular language in the instruction, but rather by citing two articles claiming that interviews with former jurors or with randomly selected subjects show that many of the subjects failed to properly understand the concept of mitigation correctly after they had been given CALJIC No. 8.88. (See Haney & Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions* (1994) 18 Law & Hum. Behav. 411; Haney et al., *Deciding to*

---

[11]The trial court stated:

"A mitigation factor is, one, whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effect of intoxication.

"In determining penalty, you may consider, take into account, and be guided by the following factors in aggravation, mitigation:

"Any other circumstance which extenuates the gravity of the crime even though it's not a legal excuse for the crime.

"In other words, in determining penalty, as mitigation you may consider, take into account any other circumstance which extenuates the gravity of the crime even though it may not be and is not a legal excuse for the crime.

"You further may consider any other aspect of the defendant's character, his background, his history or record that he offers as a basis of a sentence less than death.

"Ladies and Gentlemen, you may consider sympathy, you may consider compassion for the defendant."

*Take Life: Capital Juries, Sentencing Decisions and the Jurisprudence of Death* (1994) 50 J. Soc. Issues 149.) In the latter study, for example, the authors purported to demonstrate that of 30 people interviewed who had formerly served on juries in capital cases, only 13 showed a "reasonably accurate comprehension of the concepts of aggravating and mitigating," while "fully one-third of our sample refocused the penalty phase inquiry entirely on the nature of the crime itself, and did so in a way that amounted to a presumption in favor of death." (Haney et al., *supra*, 50 J. Soc. Issues, at pp. 162, 169, italics omitted.)

As stated earlier, "[w]e presume that jurors comprehend and accept the court's directions." (*People* v. *Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.) The presumption that the jurors in this case understood and followed the mitigation instruction supplied to them is not rebutted by empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross examination. (See *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 26 [168 Cal.Rptr. 128, 616 P.2d 1301].) We accordingly reject defendant's claim.

### P. *Defendant's Absence from Trial*

As recounted above, defendant frequently disrupted the trial proceedings. As a result, he was removed on a number of occasions from the courtroom. At other times he requested or demanded to absent himself from the courtroom. He claims now that his Sixth Amendment right to confront witnesses, his right to due process under the Fourteenth Amendment and his right to be personally present with counsel "in a criminal cause" under article I, section 15, of the California Constitution all were violated thereby. As we have concluded, " 'as a matter of both federal and state constitutional law, . . . a capital defendant may validly waive presence at critical stages of the trial.' " (*People* v. *Jackson*, *supra*, 13 Cal.4th at p. 1210.) Moreover, a defendant may waive his right to be present at his trial by being disruptive at the trial, and appellate courts must give considerable deference to the trial court's judgment as to when disruption has occurred or may reasonably be anticipated. (See *Illinois* v. *Allen* (1970) 397 U.S. 337, 343 [90 S.Ct. 1057, 1060-1061, 25 L.Ed.2d 353]; *People* v. *Jackson*, *supra*, 13 Cal.4th at p. 1211.) We find no constitutional error arising from defendant's removal or absence at various points during the trial.

Defendant also contends that his statutory rights were violated under section 977, subdivision (b), which provides in pertinent part that in felony cases "the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when

evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he shall, with leave of court, execute in open court, a written waiver . . . ." Furthermore, section 1043, subdivision (a), recites in part that "[e]xcept as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial." "The cases which have interpreted the foregoing sections uniformly have held that the accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' " (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309 [168 Cal.Rptr. 603, 618 P.2d 149].)

Moreover, the right to be present found in section 977 is subject to qualification under section 1043, subdivision (b)(1), which permits a felony trial in a defendant's absence in "[a]ny case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom." As stated above, appellate courts accord trial courts considerable discretion in determining when disruption has occurred. Our review of the record reveals quite plainly a defendant who was persistently disruptive. We find the trial court did not abuse its discretion by either ordering defendant's removal or consenting to his absence for the sake of maintaining order in the courtroom.

Q. *Failure to Report Proceedings*

Defendant points to seven trial proceedings that were not conducted on the record. These proceedings are documented in a settled statement. ▮ Absent a showing of prejudice, these omissions are not the basis for a reversal of a conviction. (*People* v. *Holt, supra*, 15 Cal.4th at p. 708.) Defendant shows no prejudice in this case. He claims in particular that omission from the record of two conferences involving a discussion of the penalty phase jury instructions denied his right to meaningful appellate review, in violation of his Fourteenth Amendment right of due process. But these unreported conferences have been documented in the settled statement and were preliminary to more extensive discussions on the record. Moreover, we are able to review the penalty phase instructions themselves that were the subject of these conferences. Defendant has therefore not been denied his right to meaningful appellate review.

### R. *Cumulative Error*

Defendant contends that cumulative error, both at the guilt and penalty phases, constitutes reversible error. We find that none of the error made at trial was prejudicial, either considered singly or in aggregate.

### S. *Section 190.4, Subdivision (e), Motion*

 Defendant's motion to modify the verdict of death to life imprisonment without possibility of parole, pursuant to section 190.4, subdivision (e) (section 190.4(e)), was denied by the trial court. He now contends that the trial court erred in making this determination because its decision on the motion rested on impermissible considerations. We disagree.

Defendant first contends that the trial court wrongly relied on the probation officer's report in ruling on the motion. The trial court did indeed state while ruling on the section 190.4(e) motion that he had "read and considered" that report. "As we have explained, when the trial court reviews a death penalty verdict under section 190.4, subdivision (e), it is limited to consideration of the evidence presented to the penalty phase jury, which does not include the probation report." (*People* v. *Hawkins, supra,* 10 Cal.4th at p. 971.) It is nonetheless presumed that "the court was not influenced by irrelevant matters in the probation report, absent evidence to the contrary." (*Ibid.*) In the present case, there was nothing more than a passing reference to the probation report. The trial court otherwise focused on the evidence presented at trial, carefully assessing such evidence in reaching its ruling to deny defendant's motion. There is no indication that it was influenced by irrelevant matters.

Defendant also contends that the trial court erred in the manner in which it considered aggravating and mitigating evidence in ruling on the section 190.4(e) motion. Specifically, he claims it mistakenly considered the absence of "extreme mental or emotional disturbance" as set forth in section 190.3, factor (d), to be an aggravating circumstance, and that it improperly discounted evidence of his intoxication at the time of committing the crimes. The record shows, however, the trial court did not consider the absence of extreme mental disturbance to be an aggravating circumstance, but was merely explaining why it believed this factor was not present in this case to mitigate his culpability. It was also within its discretion in concluding that the evidence did not support his claim that his actions were greatly influenced by drug or alcohol intoxication. We therefore conclude that it did not err in denying his motion to modify the verdict.

### T. *Right to a Speedy Appeal*

Defendant contends that an almost three-year delay in the appointment of appellate counsel denied him a right to a speedy appeal, in violation of his

Fourteenth Amendment right of due process. He relies on *U.S.* v. *Antoine* (9th Cir. 1990) 906 F.2d 1379, 1382, and *Harris* v. *Champion* (10th Cir. 1994) 15 F.3d 1538, 1546, for the existence of such a right. As we stated in *People* v. *Holt, supra,* 15 Cal.4th at page 709, in addressing an identical claim, these decisions do not address "the unique demands of appellate representation in capital cases. [¶] [Moreover,] [n]either this court, nor the United States Supreme Court, has extended the Sixth Amendment right to speedy trial to appeals in the manner suggested by defendant. Assuming, but not deciding, that such a right exists, defendant fails to demonstrate that the delay inherent in the procedures by which California recruits, screens, and appoints attorneys to represent capital defendants on appeal, is not necessary to ensure that competent representation is available for indigent capital appellants. Moreover, defendant fails to suggest any impact that the delay could have had on the validity of the judgment rendered before that delay occurred."

Defendant contends that he was prejudiced by the delay in the appointment of counsel because this led in turn to a delay in the settled statement conference discussed above, during which a number of unreported conferences were reconstructed. He claims that such delay caused memories to fade and led to inaccuracies in the settled statement. This contention is purely speculative. Moreover, as discussed, the unreported conferences concerned preliminary discussions of matters more fully treated on the record, and the failure to hold these on the record did not impair defendant's right to obtain meaningful appellate review.

## VI. DISPOSITION

We affirm the judgment in its entirety.

**MOSK, J.**—I dissent. The trial court committed federal and state constitutional error, as well as state statutory error, when it failed to declare a doubt about defendant's competence to stand trial, in spite of its determination that defendant was incompetent to represent himself.

The majority claim that when the trial court ruled defendant incompetent for purposes of self-representation, it was employing a higher or different standard of competence than that used for determining competence to stand trial. The record below belies this position. Rather, the record reveals that the trial court denied defendant's *Faretta*[1] motion principally because he was incompetent in the ordinary legal sense: that defendant had a paranoid distrust of his own attorneys and everyone connected with the legal system,

---

[1] See *Faretta* v. *California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*).

a delusion which rendered him *incapable* of rationally assisting in his own defense. The trial court should have at that point declared a doubt about defendant's competence to stand trial and held a hearing pursuant to Penal Code section 1368.[2] The failure to do so should lead to a reversal of defendant's conviction in its entirety. Although the majority may find this conclusion disagreeable in light of the gravity of defendant's crimes, it is the conclusion that follows from a dispassionate application of established constitutional doctrine to the facts of this case.

Under the due process clause of the Fourteenth Amendment to the United States Constitution, a defendant may not be tried unless he is competent. (*Godinez* v. *Moran* (1993) 509 U.S. 389, 396 [113 S.Ct. 2680, 2685, 125 L.Ed.2d 321].) As was stated in *Dusky* v. *United States* (1960) 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824], a competent defendant is not simply someone " 'oriented to time and place [with] some recollection of events,' but [also someone who] 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . . has a rational as well as factual understanding of the proceedings against him.' " (*Ibid.*) This federal constitutional standard is codified under California law in section 1367, subdivision (a). Under section 1368, subdivision (a), "during the pendency of an action and prior to judgment, [if] a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, defendant is mentally competent." "At that point, 'all criminal proceedings must be suspended until a hearing has been conducted to determine whether the defendant is presently mentally competent.' " (*People* v. *Davis* (1995) 10 Cal.4th 463, 526 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

Moreover, the United States Supreme Court in *Godinez* v. *Moran, supra,* 509 U.S. 389, held that a defendant competent to stand trial was also competent to waive his right to representation in a *Faretta* motion "since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights." (*Id.* at p. 399 [113 S.Ct. at p. 2686]; see also *People* v. *Hightower* (1996) 41 Cal.App.4th 1108, 1114-1116 [49 Cal.Rptr.2d 40].)

Defendant contends that the evidence presented to the trial court within the context of the *Faretta* hearing led it to conclude that he was not competent to waive his right to counsel, and that, having reached that conclusion, it had to declare a doubt about his competence to stand trial. He

---

[2]All further undesignated statutory citations are to this code.

focuses in particular on the following comments made by the trial court at the conclusion of the *Faretta* hearing: "I find Mr. Welch is a defendant who does not appreciate the extent of his own disability and, therefore, cannot be fully aware of the risk of self-representation. I find the disability of Mr. Welch significantly impairs his capacity to function in a courtroom. [¶] I further find that one of the defendant's reasons he wishes to dispense with [his] defense attorney *is a paranoid distrust of everyone connected with the judicial system*. This is further evidence to this court that he lacks the mental capacity to truly waive his right to counsel." (Italics added.)

In reaching its conclusion, the trial court carefully scrutinized the record for evidence of defendant's pretrial behavior As the court stated: "The defendant's mental condition in the Court's opinion precludes realistic assessment of the need for assistance and risk of waiving counsel. Mr. Welch alleges conspiracy between the parties to the judicial system. In the matter heard before Judge Ballachey, he alleges conspiracy in these proceedings. I've listed just a few acts.

"On October 3rd . . . [he claimed] the Court, prosecution, and [his] counsel have been acting in collusion with each other.

"October 3rd . . . [he claimed] the [Alameda County] Bar Association should be disqualified from representing him, being involved in a conspiracy.

"October 4th . . . there's an accusation of back-room discussion between counsel.

"October 4th . . . Mr. Welch accuses the defense attorneys [of] acting in collusion with the District Attorney's Office . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"November 8th . . . [he] alleges a conspiracy between the judge, the District Attorney, police department, and court-appointed lawyers as well as the Public Defender and the police. . . .

"November 8th . . . he alleges ballistic materials [were] falsified by the sheriff's department.

"November 8th . . . he alleges the jail officials were monitoring the interviews with psychologists by placing listening devices throughout the room."

The trial court also referred to an incident in which defendant asked to have his attorneys sit in the jury box rather than at the counsel table because "they're adversal [*sic*] to my position right in the proceedings right now. Not only they're adversal [*sic*], they have interests of their own . . . ."

As we have stated: "*Pate* v. *Robinson* [(1966) 383 U.S. 375 [86 S.Ct. 836, 15 L.Ed.2d 815]] stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary." (*People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].) "Substantial evidence is evidence that raises a *reasonable doubt* about the defendant's competence to stand trial." (*People* v. *Frye* (1998) 18 Cal.4th 894, 952 [77 Cal.Rptr.2d 25, 959 P.2d 183], italics added.)

This doubt as to sanity may arise from delusions a defendant has about his counsel that preclude him from rationally assisting in his own defense. Thus, in *People* v. *Stankewitz* (1982) 32 Cal.3d 80 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476], we held that psychiatric testimony of defendant's paranoid delusions that his counsel, the public defender, was in collusion with the prosecution, was sufficient evidence of incompetence to trigger the trial court's duty to declare a doubt and hold a hearing as to competence. (*Id.* at pp. 92-93 (plur. opn. of Bird, C. J.); *id.* at p. 95 (conc. opn. of Broussard, J.).) We stated that once the trial court denied defendant's motion for substitution of counsel, the defendant "was left with a counsel whom [he] was unable to rationally assist . . . ." (*Id.* at p. 92.) As another court has stated: " 'If the accused is so delusional or paranoid that he will not trust his counsel or tell him the true facts, then he would be incompetent.' " (*People* v. *Valentino* (1974) 78 Misc.2d 678 [356 N.Y.S.2d 962, 968]; see also ABA Standards for Criminal Justice (2d ed. 1980) Mental Health Standards, std. 7-4.1, commentary, p. 7-174 [stating that competency to stand trial should include a determination that a defendant possesses "the capacity to maintain the attorney-client relationship, embracing an ability to discuss the facts of a case with counsel 'without paranoid distrust' "].)

In the present case we have the unusual situation of the trial court itself coming forward with substantial evidence of defendant's mental incompetence in the context of ruling on a *Faretta* motion. This evidence, as reviewed above, unmistakably called into question whether defendant, given

his paranoid delusions, would be able to rationally assist in his own defense. Indeed, this evidence was sufficiently substantial to be used by the trial court as the primary reason for denying defendant's *Faretta* motion. Although in *Pennington* we referred to the necessity of a section 1368 hearing when a defendant comes forward with substantial evidence of incompetence (*People v. Pennington, supra,* 66 Cal.2d at p. 518), the fact that in the present case the *trial court itself* produced the substantial evidence would only make the case for holding a competency hearing more compelling. "Once substantial evidence appears" of a defendant's mental incompetence, the requirements of a section 1368 hearing are triggered.

Of course, a failure or refusal of a defendant to cooperate with cocounsel is not in itself proof of incompetence. "[T]he test, in a section 1368 proceeding, is competency to cooperate, not cooperation." (*People v. Superior Court (Campbell)* (1975) 51 Cal.App.3d 459, 464 [124 Cal.Rptr. 158].) We assume, however, that the trial court understood this basic distinction. If the trial court had concluded that defendant's difficulty with his defense counsel was a result of a willful refusal to cooperate, rather than incapacity to understand counsel's role, then that refusal would have weighed *in favor of,* not against, defendant's *Faretta* motion, because the problem of noncooperation could then be solved by allowing him to represent himself. But the trial court, which spoke of defendant's "disability," his "paranoid distrust" of his counsel, and his lack of mental capacity to waive his right, clearly seemed to have concluded that defendant was more than simply unwilling to cooperate with counsel, but rather was in some psychological sense unable to do so. Thus, although the trial court did state summarily in the course of ruling on the *Faretta* motion that he found defendant competent to stand trial, that unexplained conclusion was inconsistent with the evidence he adduced in denying the *Faretta* motion.

Moreover, testimony at the penalty phase corroborated the trial court's own perception of defendant's disability. (See *People v. Clark* (1992) 3 Cal.4th 41, 108 [10 Cal.Rptr.2d 554, 833 P.2d 561] [review of penalty phase testimony used to resolve questions of competence].) The defense psychiatrist and psychologist testified at the penalty phase that defendant suffered from "paranoid delusions." Dr. Benson described their nature as follows: "I think the paranoid delusions that [come] to mind [are] basically what . . . we've seen happen here in the courtroom. And that is how when people don't see a situation as the [defendant] sees it, then that immediately causes a sort of power struggle. . . . I believe his perception is that people are against him if they don't agree with him, and certainly I think it's been demonstrated here. I think that the Judge, the district attorney, his attorneys, Dr. Pierce, and probably soon myself will be perceived as being against him . . . ."

Dr. Pierce opined that defendant had "been mentally ill for a long time" and had "a very paranoid delusional stance toward life that operates on false beliefs . . . ." He gave as an example of defendant's delusional thinking an incident in which defendant "interrupted the court and commented that his attorneys weren't standing where they usually stand and that he felt one had slid his chair over further than usual. And it was his feeling that they did this so that the bailiffs could attack him." Dr. Pierce also commented on defendant's apparent use of legal arguments. "His thinking is tangential. It is hard to follow the logic of what he's saying. It sounds good, but it doesn't make any sense." The prosecution produced no psychiatric expert to contest such testimony.

Evidence of defendant's irrational conduct, both before the *Faretta* motion was made and subsequently at trial, revealed a defendant working at cross-purposes with his counsel, struggling with his counsel over the proper defense to be presented, renewing on numerous occasions his request for either a substitution of counsel or relief from counsel altogether. This conflict was epitomized by defendant and counsel's pursuit of opposing defense strategies—defendant claiming actual innocence, counsel claiming lack of premeditation and deliberation. When defendant did testify, against counsel's advise, he did so without any consultation with counsel regarding the nature of his testimony. When counsel asked the court for a recess in which to consult with his client, defendant requested a substitution of counsel "if my counsel is not ready to proceed." Moreover, defendant made over 150 objections on his own during the course of the trial. The picture of defendant that emerges at trial is consistent with the view of the trial court and the mental health experts that he was uncooperative with counsel because of his belief that they were in collusion with the prosecution and acted adversely to his own interests.[3]

The majority point to our statement in *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228], that "more is required to raise a doubt [as to competency] than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense." In the present case, however, both the trial court's observations and the psychiatrist's and psychologist's conclusions were directly pertinent to defendant's "ability to assist in his own defense." Nor was this perceived

---

[3] I further note that defendant has persisted in making a number of motions in this court to replace his current appellant counsel due to what amounts essentially to a lack of trust, despite appellate counsel's more than competent efforts.

inability based on defense counsel's statements, but on independent observations of defendant's actions.

The majority argue in essence that because the trial court was apparently under the misconception that the standard for determining a defendant's competence to represent himself was supposedly different from and higher than the standard for determining the competence to stand trial, then what the trial court said about the former type of competence should not necessarily reflect on the latter type. And because the majority claim there are grounds for upholding the denial of the *Faretta* motion other than competence, both the trial court's *Faretta* ruling and its failure to hold a hearing on defendant's competency to stand trial should be upheld. The problem with this argument is that it finds little if any support in the record. A review of the record reveals that the trial court may have had a certain misconception about the meaning of competence in the context of a *Faretta* motion—specifically that in addition to being competent to waive the right to counsel, which involves competence in the ordinary legal sense, the defendant must also possess the "minimal ability to present a personal, competent defense." The United States Supreme Court made clear in *Godinez* that competence to waive, not competence of self-representation, was the sole competency concern in ruling on a *Faretta* motion. (See *Godinez* v. *Moran, supra*, 509 U.S. at p. 399 [113 S.Ct. at pp. 2686-2687].) But the record, as cited above, also reveals that the main focus of the trial court's inquiry in ruling on defendant's *Faretta* motion was not on his ability to represent himself but rather on his incompetence, in the ordinary legal sense, to waive the right to counsel because of his extreme, paranoid distrust of counsel and his belief that they were in league with the rest of judicial system and against his interests. In other words, the trial court's apparent misconception regarding *Faretta* competency was not central to its determination of defendant's incompetence to waive counsel. Because it appears from the record that the trial court's determination of defendant's incompetence to waive his right to counsel was supported by substantial evidence—i.e., evidence raising a reasonable doubt as to his competence—the trial court should have taken the next step of ordering a section 1368 hearing.

The majority also suggest that, although the trial court used the term "incompetence" when denying the *Faretta* motion, what it really meant was that the defendant lacked not competence per se but rather the ability to make a knowing and voluntary waiver of his right to counsel. This argument is without merit. The *Godinez* court did indeed make clear that, in addition to a determination of competence, a knowing and intelligent waiver must be given before a motion for self-representation may be validly granted. (*Godinez* v. *Moran, supra*, 509 U.S. at p. 400 [113 S.Ct. at p. 2687].) But the

*Godinez* court clarified the difference between the competency and waiver requirements. "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. [Citation.] The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced. See *Faretta* v. *California, supra,* [422 U.S.] at 835 [95 S.Ct. at p. 2541] (defendant waiving counsel must be 'made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open"') . . . ; *Boykin* v. *Alabama* [(1989)] 395 U.S. [238,] 244 [89 S.Ct. 1709, 1712-1713, 23 L.Ed.2d 274] (defendant pleading guilty must have 'a full understanding of what the plea connotes and of its consequence')." (*Godinez* v. *Moran, supra,* 509 U.S. at p. 401, fn. 12 [113 S.Ct. at pp. 2687-2688], italics in original.)

As the above remarks and the references to *Faretta* and *Boykin* v. *Alabama* (1989) 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274] make clear, the inquiry into whether a waiver is knowing and voluntary is not an inquiry into defendant's mental capacity, but rather largely into the sufficiency of the trial court's effort to adequately warn defendant of the consequences of the waiver. (See, e.g., *People* v. *Lopez* (1977) 71 Cal.App.3d 568, 573-574 [138 Cal.Rptr. 36] [warning required, and specific warnings suggested, before granting *Faretta* motion].) In the present case, the trial court did not attempt to inform defendant of the consequences of waiver, and so there is no question of defendant's failing to comprehend specific information furnished to him by the trial court. Rather, the trial court's *Faretta* ruling was grounded in the judgment that defendant lacked the mental capacity to waive, regardless of the warnings given, owing chiefly to his delusional outlook. It is, in short, clear from the record that the trial court's denial of the *Faretta* motion was based on the competency prong, rather than the "knowing and voluntary waiver" prong, of the *Faretta* inquiry.

I emphasize the narrowness of the holding I propose. I would not hold that any time a court denies a *Faretta* motion, it must hold a competency hearing. There may be grounds other than competence for denying such a motion. Nor would I hold that a competency hearing is required each time it becomes manifest that a defendant mistrusts and is in conflict with his counsel. Nor, of course, do I conclude that defendant in this case was in fact incompetent to stand trial. All I would hold is that when, as here, evidence of a defendant's mental incompetence and mental incapacity to cooperate with counsel is sufficiently substantial so as to validly serve as the primary reason for denying a defendant's *Faretta* motion, then it is incumbent on the trial

court to hold a hearing on the defendant's competence to stand trial under section 1368.

An error in failing to declare a doubt as to competence is reversible per se. (*People* v. *Stankewitz, supra,* 32 Cal.3d at p. 94.) " 'Nor, as the United States Supreme Court specifically held in *Pate* v. *Robinson* [(1966) 383 U.S. 375, 387 [86 S.Ct. 836, 843, 15 L.Ed.2d 815]] . . . , may the error be cured by a retrospective determination of defendant's mental competence during his trial.' " (*Ibid.*) Thus, I would reverse the judgment in its entirety.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied August 18, 1999. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.